693 A.2d 344

**Eric T. WILSON,**

v.

**STATE of Maryland.**

**No. 62 Sept.Term., 1996.**

Court of Appeals of Maryland.

May 6, 1997.

Daniel H. Weiss, Assistant Public Defender (Stephen E. Harris, Public Defender; Shannon E. Avery, Assistant Public Defender, on brief) Baltimore, for Petitioner.

Devy Patterson Russell, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

WILNER, Judge.

Petitioner, Eric Wilson, was convicted by a jury in the Circuit Court for Baltimore City of possession of heroin, for which he was sentenced to two years in prison. In this appeal, he complains that the court erred in refusing to issue a body attachment for one of his witnesses, whom he had duly subpoenaed and who failed to appear in court. In an unreported opinion, the Court of Special Appeals found no merit to that complaint and affirmed the judgment. We shall reverse.

### FACTUAL BACKGROUND

Wilson was arrested when the police discovered and terminated a drug operation being conducted in the 1800 block of N. Chapel Street on the afternoon of September 16, 1994. There is really no dispute that such an operation was being conducted. Wilson's defense was that he was not part of it.

Officer Michael Burkette testified that he covertly surveilled that block of Chapel Street from 3:00 to 3:20 p.m. and observed 30 to 40 people, some with money in their hand, walk into the area, loiter a bit, enter an alley that ran between Chapel and Washington Streets, return in a minute or two, and then briskly leave the area. Although he was unable to observe anything that happened in the alley, which was beyond his vision, Officer Burkette believed that he was witnessing a drug operation, and he therefore called for an arrest team.

Two members of the arrest team also testified. Officer Thomas Jeffries, upon receiving the call from Officer Burkette, drove into the alley behind the 1800 block of N. Chapel Street and observed Wilson stuffing what appeared to be a plastic bag into a fence post. Jeffries shouted "there he is," or words to that effect, and jumped out of the car, whereupon Wilson ran into the rear of 1827 N. Chapel Street. Officer

Jeffries did not chase Wilson, although he saw fellow Officer Christopher Cooper run into the house; instead, Jeffries went to the fence post, where he found a plastic bag containing 11 gelatin capsules of white powder that later was determined to be heroin. As soon as he retrieved that bag, he yelled a signal to Officer Cooper to arrest Wilson. Officer Jeffries said he remembered seeing other people in the alley and that there may have been people sitting on the steps of the house.

Officer Cooper also saw Wilson run into the rear of 1827 N. Chapel Street, without knocking. Cooper chased him into the house, up the stairs, and into a second floor bathroom. Cooper said that, although he was only 10 feet behind Wilson, he was unable to get upstairs before he heard a toilet flush. He testified that Wilson had no time actually to use the bathroom, that the bathroom door was open, and that Wilson was facing away from the toilet. Officer Cooper saw some women in the house but no other men.

The defense case was presented through the testimony of Wilson and Shantae Jennings, both of whom told a somewhat different story from that related by the police officers. Ms. Jennings stated that she was sitting on the steps at the rear of 1827 N. Chapel watching the drug sales in the alley. The house in question was then being occupied by her friend, Andrea Coleman, who was in the kitchen with Jacqueline Harris. She saw Wilson come down the alley wearing a backpack. Wilson asked Ms. Jennings to accompany him to his house but, when she agreed, said that he first had to go to the bathroom and entered Ms. Coleman's house for that purpose. Just then, she said, one or more of the drug ring's lookouts yelled "Roy," a code word for the approach of the police, and all of the men ran. Some ran down the alley, but four ran into Ms. Coleman's house. One of the men who ran into the house was "Be Boy"—he was the person Ms. Jennings said was actually selling the drugs.

According to Ms. Jennings, the police spent about 10 minutes searching in the alley and then found the drugs. The

next time she saw Wilson was some 15 minutes later, when an officer brought him, handcuffed, out of the house.

Wilson testified that he was a student at Morgan State University and that he went by the rear of N. Chapel Street to visit friends on his way home from classes. He confirmed the version of events given by Ms. Jennings—that he asked her to accompany him to his house, that she agreed, and that he went upstairs to use the bathroom before leaving. While in the bathroom, with the door closed, he heard a commotion. As the bathroom door opened—he did not indicate who opened it—he saw police officers at the doorway, one of whom said, "There he is." The officers took him into custody, searched him, and then handcuffed him. Only then, according to Wilson, did the officers outside indicate that they had found the drugs. Wilson denied that the drugs belonged to him, although he acknowledged knowing "Be Boy" and the other men who were in the alley.

Wilson was initially charged with breaking and entering Ms. Coleman's house, along with the possession offense. The court granted his motion for judgment of acquittal as to the breaking and entering charge at the end of the State's case.

### THE MISSING WITNESSES

Wilson's trial commenced at 10:00 a.m. on June 15, 1995. Immediately after selection of the jury, defense counsel informed the court that she had submitted requests for subpoenas for Andrea Coleman and Jacqueline Harris but that it did not appear that those subpoenas had been served. She said that she had prepared new subpoenas for those witnesses, whose testimony she contended was "imperative for the defense," and intended to have them served by private process server at noontime. The court made no substantive comment, and the trial then began.

The State concluded its case in the early afternoon, at which point counsel noted that one of her witnesses—Ms. Jennings—was in court but that she had received no word with respect to Ms. Coleman or Ms. Harris, neither of whom was in court.

The court had indicated that it would recess by 3:30. Counsel thereupon proceeded with the testimony of Ms. Jennings and Mr. Wilson. Court recessed at 3:11 p.m. Before excusing the jury, the court announced that the case would resume at 2:00 p.m. the next day.

When trial resumed at 2:14 p.m. on June 16, neither Mr. Wilson nor the two other witnesses were in court. Counsel informed the court that Ms. Coleman had been served with a subpoena, and she asked for a body attachment. Apparently miffed at Wilson's absence, the court asked why it should "subpoena a witness for the defendant who refuses to come to court." Counsel responded that she had filed a proper request for subpoena on June 7, that the subpoena issued the day before had, in fact, been served at Ms. Coleman's new address, which she gave to the court, and that the witness had been ordered to report by 1:30. She urged that, with or without Wilson, she "can't go forward without this particular witness...." The court responded, without any foundation for its remark, that "[h]e doesn't want to be here. He doesn't want his witness—this is his good friend. He doesn't want his witness to be here." [1]

After some further brief discussion, Mr. Wilson appeared and said that he did want Ms. Coleman to testify. He indicated that he had attempted to reach her by telephone but that the phone had been disconnected. There was some further indication that he had intended to pick up the witness and bring her to court. Although counsel said that she did not know where Ms. Coleman was at the moment, she did have the woman's new address and asked that the sheriff be dispatched.

---

1. At this point, it seems that a body attachment was requested only with respect to Ms. Coleman. It does not appear that Ms. Harris had been served, and no further action was requested as to her. As to Ms. Coleman, there was no basis for the court's statement that she and Wilson were good friends. Wilson never said that Ms. Coleman was his good friend. All he said was that he knew her and that, on hot days, some people from the neighborhood congregated in her back yard because it was cool there. There was no evidence of any close personal relationship between Wilson and Coleman.

The court initially agreed, if a sheriff was immediately available, and it asked the deputy sheriff in the courtroom to check to see if another deputy could be sent to the new address. It noted: "We'll see if we can get a sheriff out there. It shouldn't take more than—if we can get somebody immediately, it shouldn't take more than 20 minutes to get somebody out there and determine if they can or can't have the witness here." After a pause, the courtroom deputy returned to inform the court that, because of an amnesty program operating that day, "they just can't turn nobody loose." When the prosecutor suggested that the witness was only going to testify with respect to the breaking and entering charge, which had already been disposed of, counsel responded that that was not the case—that Ms. Coleman "would be offering the viewpoint of being inside the house."

The court then concluded that "we can't execute a body attachment today and we have no alternative but to proceed to conclusion." Counsel objected and asked for a postponement, which the court denied. The court noted that it had recessed early the day before and started late that day because of its own schedule, and that it did not intend to bring the jury back again on a third day. It said:

"The likelihood that we're going to get that witness in here and have her testify and help to—your client seems so remote, it just does not warrant the expenditure of other resources.

I was perfectly willing to see if we could get a sheriff out there right away and determine whether he could find her, and if he could find her, bring her in and complete it this afternoon, but I'm not going to bring this jury back on Monday with the hope that he is going to find a witness who is a good friend of the defendant and who has refused to come in without a subpoena yesterday, who has been served with a subpoena, and now he has lost contact with her."

Counsel protested that she had never characterized Wilson and Coleman as being good friends. She asked if one of the police officers present in the courtroom could be sent to locate

Ms. Coleman; the court rejected that request. With no other evidence to present, the defense rested. The court denied Wilson's motion for judgment of acquittal and, after instructions and closing argument, the case was submitted to the jury.

## DISCUSSION

The Sixth Amendment to the U.S. Constitution provides, in relevant part, that an accused in a criminal prosecution has the right "to have compulsory process for obtaining witnesses in his favor...." Article 21 of the Maryland Declaration of Rights, which has been part of our Constitution since 1776 and may have served as the model for Madison's draft of the Sixth Amendment, affords a similar right.[2]

The Sixth Amendment right did not become applicable in State prosecutions until 1967, with the rendition of *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). Prior to then, this Court had construed the analogous provision in Article 21 on a number of occasions. In *Edmondson v. Brady*, 188 Md. 96, 52 A.2d 96, *cert. denied*, 331 U.S. 792, 67 S.Ct. 1508, 91 L.Ed. 1820 (1947), the appellant, appealing from the denial of his petition for habeas corpus,[3]

---

2. *See* Peter Westen, *The Compulsory Process Clause*, 73 MICH.L.REV. 71 (1974). Professor Westen notes that much of the Sixth Amendment was adopted by Congress as James Madison had drafted it, that, although the balance of his draft was almost identical to the amendment proposed by Virginia in its ratification of the Constitution, the language of the compulsory process clause differed from the Virginia proposal, and that "[o]nly a statement in Blackstone's *Commentaries on the Laws of England* and a provision in the Maryland Constitution were even arguably comparable." *Id.* at 97. Article 19 of the 1776 Declaration of Rights provided, in relevant part, that every man had the right "to have process for his witnesses [and] to examine the witnesses for and against him on oath...." Those provisions remain intact as part of current Article 21.

3. Prior to the enactment of the Post Conviction Procedure Act in 1965, an appeal from the denial of petitions for habeas corpus relief was permissible. That Act abrogated the right of appeal in such cases where the relief sought by the petition is cognizable under the Act. *See Gluckstern v. Sutton*, 319 Md. 634, 658–63, 574 A.2d 898, 910–12, *cert.*

complained that a witness he had subpoenaed at his trial failed to appear. He gave no reason for the nonappearance and apparently did not ask the court to take any action. He simply complained about her non-appearance. We rejected the complaint, holding that Article 21 "assures him process for witnesses but does not guarantee attendance of the witnesses." 188 Md. at 102, 52 A.2d at 99.

Almost identical circumstances occurred in *Copeland v. Wright*, 188 Md. 666, 53 A.2d 553 (1947), and *State ex rel. Battee v. Warden*, 191 Md. 751, 60 A.2d 187 (1948) (per curiam). In each of those habeas corpus appeals, the appellant complained that witnesses he had subpoenaed for trial had failed to appear. As in *Edmondson*, he gave no reason for the non-appearance and did not, apparently, ask the trial court for any affirmative relief. In that setting, we iterated our holding in *Copeland, supra*, 188 Md. at 668, 53 A.2d at 553, that, although an accused "is entitled to his witnesses if they can be found within the jurisdiction of the Court," the attendance of those witnesses is not guaranteed. In *Battee*, we made the statement that "an accused does not show that he has been denied any constitutional right when a witness who has been subpoenaed is not present at the trial and the accused does not give any reason for the absence of the witness." *Battee, supra*, 191 Md. at 752, 60 A.2d at 187. *See also Blount v. Wright*, 189 Md. 294, 55 A.2d 709 (1947).

Those cases all presented a fairly narrow issue, and, indeed, one that may have been moot. They constituted collateral attacks on convictions based either on the unexplained non-appearance of a witness or, as in *Blount*, on the unexplained failure of a witness to testify. In none of them, so far as we can tell, did the defendant ask the court to enforce a subpoena through the issuance of a warrant or body attachment. In that setting, the broad statement that the right of compulsory process does not constitute a guarantee of attendance was not inappropriate. In *Edmondson*, we held further that denial of

denied sub nom. *Henneberry v. Sutton*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990).

the right to compulsory process under Article 21 was not grounds for habeas corpus relief in any event, thus making the question of whether there *was* such a denial essentially moot. *Edmondson, supra,* 188 Md. at 102, 52 A.2d at 99.

The jurisprudence under the Sixth Amendment is more extensive than this narrow line of cases construing Article 21. In holding the Sixth Amendment right applicable in State prosecutions, as an element of due process guaranteed by the Fourteenth Amendment, the Supreme Court noted, in *Washington v. Texas, supra,* 388 U.S. at 19, 87 S.Ct. at 1923, 18 L.Ed.2d at 1023:

"The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. The right is a fundamental element of due process of law."

*Accord Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). In *Pennsylvania v. Ritchie,* 480 U.S. 39, 56, 107 S.Ct. 989, 1000, 94 L.Ed.2d 40, 56 (1987), the Court noted that its cases on the compulsory process clause had established, at a minimum, "that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt."

The cases arising under the Federal right seem to fall within two broad categories: those in which a defense witness is available, or can readily be made available, and is, or would be, prepared to testify but is precluded from doing so because of some substantive (*Washington v. Texas, supra* ) or procedural (*Taylor v. Illinois,* 484 U.S. 400, 108 S.Ct. 646, 98

L.Ed.2d 798 (1988)) disqualification; and those in which a witness desired by the defendant is not in court at the appropriate time. We are dealing here with the second category—the missing, not the disqualified, witness. The Constitutional issue in that category usually, though not always, arises in the context of whether the trial court is obliged to grant a postponement or continuance in order to allow the defendant, or the court, an opportunity to locate, serve process upon, or take into custody the missing witness.

The right of compulsory process, under both the Federal and State Constitutions, though fundamental, is not absolute. It does not, for example, confer a right to present inadmissible evidence, and thus is not violated if a court declines to subpoena, grant a continuance to locate, or otherwise assist in the apprehension or production of a missing witness, in the absence of a showing that the testimony of that witness would be both admissible and helpful to the defense. The Supreme Court made that clear in *Taylor v. Illinois* and *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). In *Taylor, supra*, 484 U.S. at 410, 108 S.Ct. at 653, 98 L.Ed.2d at 811, the Court held:

"The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. The Compulsory Process Clause provides him with an effective weapon, but it is a weapon that cannot be used irresponsibly."

In *Valenzuela–Bernal*, the Court confirmed the additional element of materiality to the defense, pointing out that, to establish a violation of the compulsory process clause, the defendant "must at least make some plausible showing of how [the] testimony would have been both material and favorable to his defense." 458 U.S. at 867, 102 S.Ct. at 3446, 73 L.Ed.2d at 1202.

See also Darby v. State, 47 Md.App. 1, 421 A.2d 108 (1980), *cert. denied*, 289 Md. 734 (1981); *Roussell v. Jeane*, 842 F.2d 1512 (5th Cir.1988); *U.S. v. Tanner*, 941 F.2d 574 (7th Cir. 1991), *cert. denied*, 502 U.S. 1102, 112 S.Ct. 1190, 117 L.Ed.2d

432 (1992); *U.S. v. Rubin*, 836 F.2d 1096 (8th Cir.1988); *Marshall v. State*, 621 N.E.2d 308 (Ind.1993); *State v. Ahearn*, 137 Vt. 253, 403 A.2d 696 (1979); *Commonwealth v. Coffey*, 230 Pa.Super. 49, 331 A.2d 829 (1974); *People v. Savaiano*, 10 Ill.App.3d 666, 294 N.E.2d 740 (1973); *State v. George*, 652 So.2d 1382 (La.Ct.App.), *cert. denied*, 660 So.2d 855 (La.1995); *State v. Kennedy*, 854 S.W.2d 847 (Mo.Ct.App.1993). *Compare Washington v. Texas, supra*, 388 U.S. at 23, 87 S.Ct. at 1925, 18 L.Ed.2d at 1025, finding a right to compulsory process for a witness "who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense."

■ Nor does the right require a court to engage in a manhunt for the missing witness. It is up to the defendant to locate his or her witnesses, or at least to give the court a reasonable indication of where the witnesses may be found so that a subpoena or other process may be served. *See U.S. v. Glover*, 946 F.2d 1354 (8th Cir.1991), *cert. denied*, 502 U.S. 1079, 112 S.Ct. 987, 117 L.Ed.2d 149 (1992). In order to justify a continuance, we have required the defendant to show, among other things, an ability to locate the witness within a reasonable time. *Jackson v. State*, 214 Md. 454, 135 A.2d 638 (1957), *cert. denied*, 356 U.S. 940, 78 S.Ct. 784, 2 L.Ed.2d 816 (1958); *Jackson v. State*, 288 Md. 191, 416 A.2d 278 (1980). *See also Whack v. State*, 94 Md.App. 107, 615 A.2d 1226 (1992), *cert. denied*, 330 Md. 155, 622 A.2d 1196 (1993); *Hainesworth v. State*, 9 Md.App. 31, 262 A.2d 328, *cert. denied*, 258 Md. 727 (1970).

■ It is also incumbent on the defendant, before asking for judicial relief, to have made a diligent effort on his or her own to obtain the witness through available court process. A court is not ordinarily obliged to continue or interrupt a trial because of a missing defense witness when the defendant has failed to subpoena the witness in a proper and timely manner, in accordance with applicable rules and statutes. *Smith v. State*, 103 Md.App. 310, 653 A.2d 526 (1995); *Clark and*

*Richardson v. State,* 6 Md.App. 91, 250 A.2d 317 (1969), *cert. denied,* 254 Md. 719 (1969) (*Richardson* ), *cert. denied,* 255 Md. 740 (*Clark* ) (1969); *Nichols v. State,* 6 Md.App. 644, 252 A.2d 499 (1969); *cf. Hainesworth v. State, supra,* 9 Md.App. at 35–36, 262 A.2d at 329–30; *Goodrum v. State,* 402 So.2d 1103 (Ala.Crim.App.1981); *State v. Patterson,* 824 S.W.2d 117 (Mo.Ct.App.1992).

 With these caveats, the fact remains that, under post–1967 jurisprudence, the right to compulsory process embodies more than just the right to have a subpoena issued, even if it does not constitute an actual guarantee of attendance. We must keep in mind that the *raison d'etre* of the right of compulsory process is the right of the defendant to present a defense, and that right would hardly be served if the subsidiary right were limited to the issuance of a subpoena. A defendant needs his or her witnesses in court, not simply subject to later punishment for failure to obey a subpoena.

 The issuance of body attachments or bench warrants to bring recalcitrant witnesses before the court is a traditional and usual method of enforcing subpoenas, and it is a necessary element in the concept of compulsory process. *See U.S. v. Simpson,* 992 F.2d 1224 (D.C.Cir.), *cert. denied,* 510 U.S. 906, 114 S.Ct. 286, 126 L.Ed. 2d 236 (1993); *Ex Parte Murray,* 588 So.2d 924 (Ala.1991), *reh'g denied,* Oct. 4, 1991; *State v. Counts,* 452 A.2d 1141 (R.I.1982); *State v. Edwards,* 68 Wash.2d 246, 412 P.2d 747 (1966). Md. Rule 4–266, dealing with subpoenas, provides, in § (d), that a witness personally served with a subpoena is liable to a body attachment for failure to obey the subpoena and that a writ of attachment may be executed by the sheriff or other peace officer. Normally, when the problem of a missing witness surfaces, the defendant asks for a dual form of relief—a body attachment or bench warrant and a continuance in order to have the witness apprehended and brought to court. Generally, as was the case here, the debate centers around the continuance, rather than the issuance of additional process. The decision to issue an attachment or warrant affects only the convenience of the

witness and the officer needed to serve the process; the decision to grant a continuance also affects the convenience of the court, the jury, the prosecution, other witnesses, and possibly other cases scheduled for trial. Accordingly, the trial court is vested with a significant amount of discretion whether to grant the necessary continuance to allow the missing witness to be located, subpoenaed, or apprehended, and reversal of a judgment of conviction is appropriate only upon a finding that that discretion has been abused.

In the case before us, Ms. Coleman had been duly subpoenaed.[4] It was proffered that she was in a position to have observed at least some of what had occurred when Wilson, Officer Cooper, and possibly other men ran into her house and would therefore be able to testify on personal knowledge. There is not the slightest suggestion that her testimony as to what she may have seen and heard would not have been admissible.

It was evident, moreover, despite some unsupported skepticism on the part of the court, that her testimony could have been helpful to the defense. There was a clear conflict between Wilson and Cooper as to when Wilson entered the house, what he did there, and who else was in the house at the time. There was a broader conflict between Jennings and Wilson, on the one hand, and Cooper and Jeffries, on the other, as to who was in control of the drugs. When and for what purpose Wilson went into Coleman's house was highly

---

4. In its brief, the State suggests that the initial request for subpoena was not filed at least nine days prior to trial, as required by Md. Rule 4–265, and points to that fact as a ground for finding no abuse of discretion in the trial court's refusal to lend its aid to bringing Ms. Coleman into court. We note, first, that, even if counsel filed her request late, it does not appear that that was the cause of Ms. Coleman's non-appearance. The problem seemed to be that Ms. Coleman had moved, and it was for that reason that the initial subpoena was not served. Appellant was able to locate Ms. Coleman at her new address and, as noted, served her with a subpoena at that new address the day before she was to appear. It is clear, moreover, that the court did not decline to send the sheriff after Ms. Coleman or, alternatively, grant a continuance because of any late request by counsel. That simply did not factor into the exercise of the court's discretion.

relevant with respect to that broader conflict. If Wilson entered the house before the lookouts shouted their warning, as Jennings testified, he could not have been the person Officer Jeffries saw stuffing the drugs into the fence post.

■ The question remains, however, of whether Ms. Coleman could have been located and brought to court within a reasonable time. Two facts, in particular, are relevant with respect to that question. First, Ms. Coleman's current address was known and given to the court. She had been served with a subpoena at that address the previous afternoon. Second, the court did not reject Wilson's request for assistance because of any finding that Ms. Coleman could not be located. It was willing to dispatch a deputy sheriff if one was immediately available. The court, ultimately, declined to enforce the subpoena solely because some unknown supervisor in the sheriff's office told the deputy sent to inquire that there was no one immediately available, and, based upon that fact, the court decided that it was not going to prolong the trial for another day.

That decision, made for that reason, under the circumstances of this case, constituted an abuse of discretion.

It is not an abuse of discretion for the court to consider the convenience of the jury; nor is it an abuse to consider the extent of the delay that would be engendered by interrupting an ongoing trial to search for and apprehend a missing witness. The right of compulsory process is, however, an important, fundamental right that may not lightly be disregarded simply because some unidentified person in the sheriff's office decides that other obligations are more important. At the very least, before rejecting Wilson's request for assistance, the court should have inquired on its own whether, and when, a deputy or other authorized officer would be available. This record does not reveal just how the question was put to the supervisor by the courtroom deputy. Moreover, the inconvenience to the jury of having had to appear on two separate days was caused by the court's decision to end proceedings before 3:30 on June 15 and not to begin until 2:00

p.m. on June 16. We are not criticizing that decision but simply point out that, had the case proceeded in the normal manner, it may well have been that Ms. Coleman could have been brought to court on June 16. In light of the court's announced schedule, counsel had the subpoena call for Ms. Coleman's appearance at 1:30 p.m. on the 16th; had trial resumed at 9:30, the subpoena would have so stated and her non-appearance would have been evident and could have been dealt with at that time.

In summary, in the circumstances of this case, Wilson was denied his State and Federal Constitutional right of compulsory process, and reversal is therefore mandated.

**JUDGMENT REVERSED; CASE REMANDED TO COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND THE CASE TO THAT COURT FOR NEW TRIAL; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**