976 A.2d 336

**In re FAITH H.**

**No. 35, Sept. Term, 2009.**

Court of Appeals of Maryland.

July 22, 2009.

626

Tamara D. Sanders, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for appellant.

Julia Doyle Bernhardt, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for appellees.

Melanie Klein, Senior Staff Atty., (Legal Aid Bureau, Riverdale, on brief), for appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

BATTAGLIA, J.

This case arises from a decision by Judge Ronald B. Rubin of the Circuit Court for Montgomery County, sitting as a juvenile judge, to change the permanency plan for a one-year-old child, Faith H., from the goal of reunification with her parents, Dana H. and Michael B., to adoption by a non-relative, pursuant to Section 3–823(e)(1)(i)(3) [1] of the Courts and Judicial Proceedings Article. We are asked to consider

---

1. Section 3–823(e) of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl. Vol., 2008 Supp.) provides in pertinent part:

    *Determinations to be made at hearing.*—(1) At a permanency planning hearing, the court shall:

whether he committed reversible error in a permanency planning review hearing, by allowing the Montgomery County Department of Health and Human Services ("Department") to submit written reports in lieu of live testimony as its case-in-chief. The case revolved around whether Faith, who had been declared a child in need of assistance ("CINA")[2] at an earlier adjudicatory[3] and disposition hearing,[4] should have her permanency plan changed from reunification with her parents to adoption by a non-relative. We granted certiorari on our own initiative, *In re Faith H.*, 408 Md. 148, 968 A.2d 1064 (2009), prior to any proceedings in the Court of Special Appeals, to review the following question:

> Did the trial court commit reversible error by allowing the Department to present its case-in-chief through written reports without any in person testimony where the natural parent objected?

---

(i) Determine the child's permanency plan, which, to the extent consistent with the best interests of the child, may be, in descending order of priority:
1. Reunification with the parent or guardian;

       *      *      *

3. Adoption by a nonrelative;
All references to the Courts and Judicial Proceedings Article are to the Maryland Code (1973, 2006 Repl. Vol.), unless otherwise noted.

**2.** A child in need of assistance "means a child who requires court intervention because: (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs." Section 3–801(f) of the Courts and Judicial Proceedings Article.

**3.** An adjudicatory hearing is a hearing under the Juvenile Causes subtitle of the Courts and Judicial Proceedings Article of the Maryland Code "to determine whether the allegations in [a petition for court intervention filed by the county department of social services on behalf of the child], other than the allegation that the child requires the court's intervention, are true." Section 3–801(c) of the Courts and Judicial Proceedings Article.

**4.** Disposition hearing "means a hearing ... to determine: (1) Whether a child is in need of assistance; and (2) If so, the nature of the court's intervention to protect the child's health, safety, and well-being." Section 3–801(m) of the Courts and Judicial Proceedings Article.

We conclude that the Department was not required to present its case-in-chief through "in person" testimony, and that the trial court did not err by allowing the Department to present its case-in-chief through written reports. Therefore, we affirm the Circuit Court's order that Faith's permanency plan be changed to adoption by a non-relative.

## I. Facts and Procedural History

Faith H. was born on September 19, 2007, to Dana H. ("Ms. H.") and Michael B. ("Mr. B."). On September 20, 2007, the Department received a report that at birth, Faith and her mother tested positive for cocaine. The Department filed a CINA petition, and Faith was placed in shelter care on September 21, 2007. On September 24, 2007, the juvenile court sustained allegations that both Faith and Ms. H. tested positive for cocaine, that Ms. H. was not employed and lacked stable housing, and that Mr. B. was incarcerated for abusing a sibling of Faith. The court ordered Faith to remain in shelter care until the adjudicatory hearing and granted limited guardianship of Faith to the Department. On October 18, 2007, the juvenile court held an adjudicatory hearing during which Ms. H. and Mr. B. stipulated to the facts and Department's recommendations in the Amended CINA petition and consented to the juvenile court's finding that Faith was a child in need of assistance. The court found:

> [T]he Child is a **child in need of assistance** BECAUSE: 1) the Child was born exposed to cocaine; 2) the Child's mother tested positive for cocaine upon the Child's birth; 3) this is the second Cina Child of the parents; 4) David, the Child's sibling, born in June 2006, tested positive for cocaine upon his birth, and Ms. H. also tested positive for cocaine and opiates upon his birth; 5) the Child has been neglected by the Child's parents, Dana H. and Michael B.; 6) the Child's parents are unable to give proper care and attention to the Child's needs; and the stipulations of the parties presented sustained the finding that continuation of the aforesaid Child in the Child's home is **contrary** to the Child's welfare and that it is not possible to return the Child

to that home of either parents because the following circumstances exist: 1) the Child's parents permitted the Child to be born exposed to cocaine; 2) the Child's parents permitted the Child's sibling, David, to be born exposed to cocaine.

(emphasis in original). The judge entered an order placing Faith under the jurisdiction of the court and committed her to the Department to be placed in foster care with supervised visitation by Mr. B. and Ms. H. Additionally, the court ordered Mr. B. to complete an anger management program through the Montgomery County Abused Persons Program, to provide the Department with proof of residence and employment, and to participate in parenting classes through the Montgomery County Responsible Fathers Program. Ms. H. was ordered to complete an outpatient drug treatment program, submit to urinalysis twice weekly, attend Narcotics Anonymous meetings twice weekly and provide verification of attendance, seek and maintain stable housing, provide the Department with proof of residence and employment, participate in parenting classes, and participate in the Abused Persons Program.[5]

In anticipation of the permanency planning hearing initially scheduled for March 31, 2009, but ultimately postponed to April 15, 2009, the Department prepared a report,[6] provided it to the court and all parties updating the court and parties regarding its recommendations, its efforts at reunification, a suggested permanency plan of adoption by a non-relative, the

5. The court set a review hearing for March 31, 2008, and a permanency planning hearing for August 11, 2008. The Department filed a motion on December 10, 2007, to advance the permanency planning hearing and consolidate Faith's case with her sibling David's case. This motion was denied. The Department filed a second motion on March 5, 2008, to re-designate the review hearing as a permanency planning hearing on the grounds that Mr. B. and Ms. H. had both failed to comply with the October 18, 2007, court orders. The court granted the motion on March 24, 2008, and re-designated the March 31, 2008, review hearing as a permanency planning hearing.

6. The Department filed a status report on March 21, 2008, before the judge ordered that the review hearing be re-designated as a permanency planning hearing. The Department amended its report and re-filed it on March 27, 2008, without significant substantive changes, to reflect the hearing's designation as that of permanency planning.

progress made by the parties, and the Department's reasons for its recommendations. In its report, the Department recommended that Ms. H. attend a drug treatment program, Narcotics Anonymous, individual therapy, and parenting classes; follow recommendations from a psychological evaluation done in conjunction with Faith's siblings' cases;[7] and participate in urinalysis for drug testing. The Department also recommended that Mr. B. attend parenting classes and participate in an anger management program.

The report also described the Department's efforts at reunification as attempting to contact the parents, supervise Faith in her current placement, make referrals for assessment and treatment programs, supervise visitation, and provide transportation to visitation. The Department recommended the permanency plan of adoption by a non-relative, because Faith had been in foster care for six months, her other siblings had been in foster care for eighteen months, neither parent had taken advantage of reunification services offered by the court or followed through with the court's orders, and Faith needed stability. The report stated that it was unlikely reunification would happen then or in the near future because of Faith's mother's substance dependence and Faith's father's procrastination in complying with the court's orders in Faith's sibling David's case.

On March 31, 2008, the court granted the parents' attorneys' motion to postpone the permanency planning hearing. On April 15, 2008, the juvenile court conducted the permanency planning hearing and found that the Department had made reasonable efforts to achieve the permanency plan of reunification, but the court rejected the Department's recommended plan of adoption by a non-relative and ordered that Faith remain committed to the Department with continued placement in foster care. The court ordered Mr. B. to participate

---

7. At the time of the trial court's proceedings, Ms. H. had given birth to six children, including Faith, and was pregnant with a seventh child, her third with Mr. B. Mr. B. had eight children, including Faith. Neither Ms. H. nor Mr. B. had custody of any of their children.

in the Responsible Fathers Program parenting classes, to participate in the Abused Persons Program's 26–week anger management program, to follow all recommendations of the psychologist's evaluation, including individual therapy and a bonding study, to sign all necessary releases of information from treatment providers to the Department, and to provide the Department with proof of residency and employment. The court ordered Ms. H. to follow all treatment recommendations from the substance abuse evaluation, to participate in the Abused Persons Program, to follow all recommendations of the psychologist's evaluation, to participate in individual therapy, to supply the Department with proof of residency and employment, to participate in parenting classes, to participate in urinalysis twice weekly, and to attend Narcotics Anonymous meetings. The court conditioned Ms. H.'s visitation with Faith on clean urine tests and attendance at Narcotics Anonymous meetings and ordered supervised visitation between Faith and Ms. H. and Mr. B. The court admonished that the permanency plan of reunification could be changed to another permanency plan, including the filing of a petition for termination of parental rights, if the parents did not make significant progress to remedy the circumstances that caused Faith's removal, or were unwilling to give their child proper care and attention. A permanency plan review hearing was set for May 27, 2008, but was later rescheduled for September 2008 in order for the Reginald S. Lourie Center for Infants and Young Children to complete the court-ordered bonding study.[8]

Between the time of the April permanency planning hearing and the September permanency plan review hearing, the

---

8. The Reginald S. Lourie Center for Infants and Young Children is a private, non-profit agency that uses scientific research and clinical experience to foster parent-child relationships and study infant and child mental health. Reginald S. Lourie Center, http://www.louriecenter.org (last visited July 17, 2009). The Lourie Center partnered with the Department of Health and Human Services to conduct a court ordered evaluation of the quality of attachment security between Faith and Mr. B., as compared to Faith's foster parents, and to consult on what would be in the child's best interest with respect to her needs and the parenting capacity of her respective caregivers.

Department filed two more permanency planning reports dated June 12, 2008, and July 14, 2008; the Lourie Center completed a report dated July 15, 2008 ("Lourie Center Report"); and the Montgomery County Citizens' Review Board for Children [9] ("Review Board") filed two reports.[10]

The Department's June Report incorporated the behavioral recommendations in its March Report, as well as the court's orders for Ms. H.'s drug testing and Mr. B.'s participation in the court ordered bonding study. The report outlined the Department's efforts to facilitate reunification between Faith and Ms. H. and Mr. B., but also explained that both Ms. H. and Mr. B. had failed to adhere to court orders, and Mr. B. continued to procrastinate. The June Report, nevertheless, recommended that the permanency plan remain reunification with both, to allow Mr. B. more time to fully prepare to have Faith returned to his care.

In its July Report, the Department changed its recommendation from reunification to adoption by a non-relative because of Ms. H.'s and Mr. B.'s failure to comply with court orders and to engage in the services offered by the Department. The Department noted that Ms. H. had not visited with her

9. The Citizens' Review Board for Children was established by the Legislature as the Foster Care Review Board in 1978 to "spur efforts to provide permanence in the lives of foster children. It consists of a State Board and local boards in all counties. Since its inception, CRBC members have contributed more than 1 million hours of volunteer service." Department of Human Resources, Citizens' Review Board for Children, http://www.dhr.state.md.us/crbc/program.php (last visited July 17, 2009). Montgomery County has five citizen review boards for children, each run by volunteers appointed by the Governor for 4-year terms. *See* Montgomery County Maryland Government Executive Branch, Community Services, http://www.msa.md.gov/msa/mdmanual/36loc/mo/html/moe.html (last visited July 17, 2009).

10. The Montgomery County Citizens' Review Board for Children filed its first case recommendation report, dated May 6, 2008, and stated that the Board was unable to make a recommendation because there was no quorum. The Board filed a second report dated June 24, 2008, and noted that based on its review of the record and the permanency plan presented in the Department's June Report, the Board disagreed with the Department's goal of reunification and recommended that the primary plan of reunification be changed to adoption.

children and that Mr. B. had failed to complete the court ordered services since December 2007, that Mr. B. had been recently terminated from the Abused Persons Program, had not acquired appropriate housing, had not provided employment verification, and had not completed parenting classes. The Department also relied on the recently completed bonding study conducted by the Lourie Center's Child Placement Consultation Team ("CPCT"), which found that:

> While [Mr. B.] has shown positive interactions with Faith and David during his weekly supervised visitations and the CPCT observation, the CPCT has serious concerns about [Mr. B.'s] ability to respond to Faith's and David's social-emotional and developmental needs *over time*. The history of [Mr. B.'s] conviction and incarceration for child abuse, his own physical abuse history, his poor judgment regarding his long and ongoing relationship with [Ms. H.], his relationship instability, his emotional difficulties . . . his housing instability, and lack of follow through on several therapeutic recommendations, including the Abused Person's Program and parenting classes, indicate that both David and Faith would be placed at significant risk of exploitation for neglect and/or abuse should reunification occur.

(emphasis in original). By the time the juvenile court convened on September 26, 2008, the Department and the Lourie Center had submitted reports, provided to the court and all parties, stating that it was in Faith's best interest to have her permanency plan changed from reunification to adoption by a non-relative.

On September 26, 2008, the juvenile court held a permanency planning review hearing with respect to Faith and her brother David.[11] The Department presented its case-in-chief by offering into evidence its July Report and the Lourie Center Report in lieu of live testimony:

---

11. The court reaffirmed David's permanency plan of adoption by a non-relative and ordered that David shall remain CINA, remain under the jurisdiction of the court, and remain committed to the Department for continued placement in foster care.

[DEPARTMENT:] And I believe that's the extent of, I think those [reports] amply set out the Department's case for the permanency plan that the Department's requesting of adoption by a non-relative. And we would propose under *In Re: Ashley E.*, [387 Md. 260, 874 A.2d 998 (2005)] that the Department submit for Your Honor's consideration those reports in lieu of live testimony. . . .

THE COURT: All right.

[DEPARTMENT:] But it's not our intention to elicit any testimony today, but merely submit these reports.

The only objection raised by Ms. H. was that the Department's Report had not been updated since she received it in July of 2008.[12]

In addition to a request to redact the words "addiction" and "addicted," with reference to Faith, from the Department's Report, Mr. B. did object to the Department proceeding without eliciting direct testimony from any witnesses and argued that he would be at a disadvantage if the Department were not to call the reports' authors for direct examination, because he would have to call them as adverse witnesses. In response, the court clarified that Mr. B. would be allowed to cross-examine the reports' authors were he to call them to the stand, and also noted that the authors were available in court for cross-examination. The judge also remarked that Mr. B. could present any relevant or admissible evidence on his behalf:

[MR. B.'S COUNSEL:] And in reference to, to Your Honor's question, we do want the Department to present their case in full, because we think that if we only get to cross-examine the, the Department's witnesses that puts us in a situation where we probably would be calling them as adverse witnesses and we think we are, we would be at a disadvantage if we were to do that. Because, and we're—

---

12. Ms. H. did not appeal from the juvenile court's order that the permanency plan be changed from reunification to adoption by a non-relative. She is not a party to these proceedings.

THE COURT: Why? I'll let you lead them to a fair thee well, you'll take them on cross. You don't, you're not, you're not sponsoring the witness, you can cross him by any appropriate method possible. And since you know exactly what they're going to say, you're not at a disadvantage at all. You have exactly what they're going to say.

[MR. B.'S COUNSEL:] Well, we still have to develop what they are, what their testimony would be. And we don't want to be in that position. We just want to be—

THE COURT: No, you don't.

\* \* \*

[MR. B.'S COUNSEL:] This case was set for a whole day, and so it's not a time factor. That's not the reason why the Department doesn't want to put on their case. They just find it for convenience sake. And had we known this is the way they were going to, they would have proceeded, we also would've written our report and had, and had our clients available, you know, for cross-examination. And—

THE COURT: I'm not stopping you from presenting any relevant or admissible evidence that you want. Present away.

Available in the court at that hearing were Faith's foster parents, social workers Tiffani Bradley and Dianna McFarlane, who signed the Department's Report, and Dr. James Venza from the Lourie Center, who authored the bonding study. Although Ms. H. and Mr. B. declined to cross-examine Faith's foster parents, Dr. Venza was subjected to cross-examination regarding the Lourie Center Report, and specifically, with respect to Faith's "secure attachment" to her foster parents, as opposed to her "anxious attachment" to Mr. B., Mr. B.'s counsel asked whether it was possible "that secure attachment could then be given to a third person if that third person were to spend more time with them," to which Dr. Venza replied that it was possible "under very specific conditions." The State then proceeded to conduct a "re-direct examination" of Dr. Venza regarding the congruency of the

finding of "anxious attachment" compared with his concern about Mr. B.'s ability to parent, at which time Mr. B.'s counsel objected to the amount of time Dr. Venza took to evaluate Mr. B. The following colloquy ensued:

[MR. B.'S COUNSEL:] We renew our objection to proceeding in this manner again, because it puts us at a disadvantage. I mean, why would I, I want to go ahead and ask the doctor something like that that's already in the report? It doesn't make any sense. Had he testified, we don't know what exactly he would have testified to.

\* \* \*

THE COURT:—that is not a new objection. It's a, you can renew it, and the same ruling you have had—you know, most lawyers in cases wish would, would, would give a lot of money for the direct testimony of a witness on a, on a hard piece of paper before they conduct their cross-examination because they know exactly what was said, they know exactly how it was said, and they don't have to sit there and write notes furiously. Not only are you not at a disadvantage, you are at an advantage. And I know that from trying cases for 25 years. It is much easier to cross-examine a witness when you have in writing the report of an expert. It's much easier to take the expert—no offense, take the expert apart when you have that. It's hard to do if they're just giving you on direct in open court what they're going to have to say, because not only do you have to listen and watch the witness and write it down at the same time. So I completely disagree you're disadvantaged. Overruled.

The parties proceeded to cross-examine Tiffani Bradley and Dianna McFarlane, signers of the Department's Report. Ms. Bradley was cross-examined by Mr. B.'s counsel concerning her observations of Mr. B. during his visits with Faith and his completion—or lack thereof—of anger management and parenting classes. Although Mr. B. was able to interact with Faith during his one hour visits, according to Ms. Bradley, the Department was concerned about Mr. B.'s ability to care for his children 24 hours a day, seven days a week.

Mr. B.'s counsel proceeded to cross-examine Ms. McFarlane and focused on the Department's actions in helping Mr. B. obtain housing. Counsel sought and gained confirmation that Mr. B. had complied with several court ordered classes and evaluations. Ms. McFarlane also testified that Mr. B. came prepared to visits with David and Faith and engaged with the children.

Neither Ms. H. nor Mr. B. took the stand or presented any testimony. Numerous exhibits offered by the parents were received into evidence and read by the judge at that time.

Thereafter, Judge Rubin filed a fourteen page opinion, in which he adopted the findings of the Department's reports, found that the witnesses testified credibly at the September 26, 2008, permanency planning review hearing, and applied the factors set forth in Sections 5–525(e)(1) [13] and 5–525(e)(2) [14] of

---

13. Section 5–525(e)(1) of the Family Law Article provides:
    (e) *Development of a permanency plan.*—(1) In developing a perma-
    nency plan for a child in an out-of-home placement, the local depart-
    ment shall give primary consideration to the best interests of the
    child. The local department shall consider the following factors in
    determining the permanency plan that is in the best interests of the
    child:
    (i) the child's ability to be safe and healthy in the home of the child's
    parent;
    (ii) the child's attachment and emotional ties to the child's natural
    parents and siblings;
    (iii) the child's emotional attachment to the child's current caregiver
    and the caregiver's family;
    (iv) the length of time the child has resided with the current caregiv-
    er;
    (v) the potential emotional, developmental, and educational harm to
    the child if moved from the child's current placement; and
    (vi) the potential harm to the child by remaining in State custody for
    an excessive period of time.
    All references to the Family Law Article are to Maryland Code (1984,
    2006 Repl. Vol.), unless otherwise noted.
    As of October 1, 2008, Section 5–525(e)(1) was amended to add the
    phrase, "including consideration of both in-State and out-of-state place-
    ments" to the end of the first sentence in (e)(1). Md. Code (1984, 2006
    Repl. Vol., 2008 Supp.).

14. Section 5–525(e)(2) of the Family Law Article provides:
    (2) To the extent consistent with the best interests of the child in an
    out-of-home placement, the local department shall consider the fol-
    lowing permanency plans, in descending order of priority:

the Family Law Article. Judge Rubin found that Ms. Bradley testified credibly and further found that the Department had offered substantial services to the parents in an effort to achieve a permanency plan other than adoption. The court also found that Ms. H. and Mr. B. repeatedly failed to timely and substantially comply with court-ordered and Department-offered services, and that since Faith's sibling David was removed from his parents in October 2006, both parents continued to procrastinate, preferring instead to lead a life of fulfilling their own personal wants and needs, which did not leave room for the fulfillment of parental obligations. The court also found that Dr. Venza's testimony, regarding the Lourie Center Report, thoroughly and cogently explained why removing Faith from her foster parents, and returning her to her biological parents, would be inimical to Faith's best interests. The court concluded that, "[d]espite being afforded ample reunification efforts," neither Ms. H. nor Mr. B. "meaningfully ameliorated the conditions that brought [Faith] into care," and both were "wholly incapable of fulfilling parental obligations." In assessing the factors set forth in Section 5–525(e)(1) of the Family Law Article, Judge Rubin found that Faith was "attached to her current caregivers and ... would suffer emotional, developmental, and educational harm if she were removed from their care." Further applying the factors

---

(i) returning the child to the child's parent or guardian, unless the local department is the guardian;

(ii) placing the child with relatives to whom adoption, custody and guardianship, or care and custody, in descending order of priority, are planned to be granted;

(iii) adoption in the following descending order of priority:

    1. by a current foster parent with whom the child has resided continually for at least the 12 months prior to developing the permanency plan or for a sufficient length of time to have established positive relationships and family ties; or

    2. by another approved adoptive family; or

(iv) another planned permanent living arrangement that:

    1. addresses the individualized needs of the child, including the child's educational plan, emotional stability, physical placement, and socialization needs; and

    2. includes goals that promote the continuity of relations with individuals who will fill a lasting and significant role in the child's life.

set forth in Section 5–525(e)(2) of the Family Law Article, the judge found that Faith had also "established positive relationships and family ties with her current caregivers." After considering the record evidence, Judge Rubin concluded that it would not be safe for Faith to be returned to her mother, that Faith would suffer emotional harm and neglect if she were returned to her biological parents' care, that Faith had bonded with her foster parents, and that Faith would suffer emotional harm if she was removed from her current placement. After finding no relative placement reasonably available for Faith, the court concluded that it would not be in Faith's best interests to remain in foster care indefinitely and ordered that Faith's permanency plan be changed to a plan of adoption by a non-relative, from which Mr. B. appeals.

## II. Discussion

▬▬▬ Mr. B. contends that he was entitled to a mode of presentation at the hearing that included live testimony because he had the right to confront witnesses. He maintains that in person testimony would permit a judge to assess witness credibility and demeanor, and that there is no "support for the proposition that the Department . . . can proceed by way of proffer and refuse to present their case-in-chief by way of live testimony when the parent objects to this process." [15] He also claims that his due process rights were violated by the mode of presentation and that he was prejudiced by the lack of direct testimony by the authors of the reports.

---

**15.** Mr. B. erroneously asserts that the State proceeded by way of "proffer." "Proffered evidence" is defined as "[e]vidence that is offered to the court to obtain a ruling on its admissibility." Black's Law Dictionary 598 (8th ed.). Here, the docket entries clearly reflect that the challenged reports were admitted into evidence, not merely proffered. As a result, we do not need to address Mr. B.'s reliance upon *In re Billy W.*, 387 Md. 405, 875 A.2d 734 (2005), and *In re Damien F.*, 182 Md.App. 546, 958 A.2d 402 (2008), which only dealt with a judge's reliance on proffers of evidence and not evidence admitted into the record.

Conversely, the State argues that the Department's challenged reports were admitted and, in fact, the Department's Report and the Lourie Center Report were admissible under Sections 3–823 [16] and 3–826,[17] and 3–816,[18] respectively, of the Courts and Judicial Proceedings Article, none of which, they argue, requires them to present live testimony as a condition precedent to admissibility. In addition to the argument that evidence standards are more flexible in permanency planning hearings, under *In re Ashley E.*, the State maintains that the Lourie Center Report met the Report was timely served on the parties, and the parents were permitted to challenge the Report's findings through cross-examination of the Report's authors. Additionally, the State argues that the Department was required to prepare a permanency planning report for the review hearing, and the juvenile court was required to consider the Department's reports in determining the appropriate plan for Faith.

The statutory scheme governing dispositional and review hearings in CINA cases envisions that the juvenile court will

---

**16.** Section 3–823 of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl. Vol., 2008 Supp.) provides in pertinent part:

(d) *Distribution of permanency plan.*—At least 10 days before the permanency planning hearing, the local department shall provide all parties and the court with a copy of the local department's permanency plan for the child.

**17.** Section 3–826 of the Courts and Judicial Proceedings Article provides in pertinent part:

(a) *Reports prior to hearings.*—(1) Unless the court directs otherwise, a local department shall provide all parties with a written report at least 10 days before any scheduled disposition, permanency planning, or review hearing under § 3–819 or § 3–823 of this subtitle.

**18.** Section 3–816 of the Courts and Judicial Proceedings Article provides in pertinent part:

(c) *Admissibility; inspection; impeachment evidence.*—(1) The report of a study under this section is admissible as evidence at a disposition hearing but not at an adjudicatory hearing.

(2) The attorney for each party has the right to receive the report at least 5 days before its presentation to the court, to challenge or impeach its findings and to present appropriate evidence with respect to it.

rely on reports submitted by the Department and other entities. In the present case, three reports were submitted to the court—the Department's Report, the Lourie Center Report, and the Review Board's Report—although only the first two appear to be the subject of Mr. B.'s challenge.[19] Once a child has been found CINA, pursuant to Section 3–819[20] of the Courts and Judicial Proceedings Article, and a child is committed to an "out-of-home placement,"[21] a permanency planning hearing must be held within 11 months to determine an appropriate plan for the child under Section 3–823(b)[22] of the

---

19. The Citizens' Review Board filed a report, as required by Section 3–823(j) of the Courts and Judicial Proceedings Article, but the judge did not refer to it in his memorandum opinion.

20. Section 3–819 of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl. Vol., 2008 Supp.) provides in pertinent part:

    (b) *Dispositions on petition.*—(1)  In making a disposition on a CINA petition under this subtitle, the court shall:
    
    \*      \*      \*
    
    (iii) Subject to paragraph (2) of this subsection, find that the child is in need of assistance and:
    1.   Not change the child's custody status; or
    2.   Commit the child on terms the court considers appropriate to the custody of:
        A.   A parent;
        B.   Subject to § 3–819.2 of this subtitle, a relative, or other individual; or
        C.   A local department, the Department of Health and Mental Hygiene, or both, including designation of the type of facility where the child is to be placed.
    (2) Unless good cause is shown, a court shall give priority to the child's relatives over nonrelatives when committing the child to the custody of an individual other than a parent.

21. An "out of home placement" is defined as "placement of a child into foster care, kinship care, group care, or residential treatment care." Md. Code (1984, 2006 Repl. Vol., 2008 Supp.), § 5–501(m) of the Family Law Article.

22. Section 3–823(b) of the Courts and Judicial Proceedings Article, Maryland Code (1973, 2006 Repl. Vol., 2008 Supp.) provides:

    (b) *Permanency planning hearing.*—(1)  The court shall hold a permanency planning hearing to determine the permanency plan for a child:

Courts and Judicial Proceedings Article, and periodic reviews must be conducted by the court pursuant to Section 3-823(h) [23] of the Courts and Judicial Proceedings Article.[24] In prepara-

---

(i) No later than 11 months after a child committed under § 3-819 of this subtitle . . . enters an out-of-home placement.

**23.** Section 3-823(h) of the Courts and Judicial Proceedings Article, Maryland Code (1974, 2006 Repl. Vol., 2008 Supp.) provides in pertinent part:

(h) *Periodic reviews.*—(1)(i) Except as provided in subparagraphs (ii) and (iii) of this paragraph, the court shall conduct a hearing to review the permanency plan at least every 6 months until commitment is rescinded or a voluntary placement is terminated.

(ii) The court shall conduct a review hearing every 12 months after the court determines that the child shall be continued in out-of-home placement with a specific caregiver who agrees to care for the child on a permanent basis.

*        *        *

(2) At the review hearing, the court shall:

(i) Determine the continuing necessity for and appropriateness of the commitment;

(ii) Determine and document in its order whether reasonable efforts have been made to finalize the permanency plan that is in effect;

(iii) Determine the extent of progress that has been made toward alleviating or mitigating the causes necessitating commitment;

(iv) Project a reasonable date by which a child in placement may be returned home, placed in a preadoptive home, or placed under a legal guardianship;

(v) Evaluate the safety of the child and take necessary measures to protect the child; and

(vi) Change the permanency plan if a change in the permanency plan would be in the child's best interest.

(3) Every reasonable effort shall be made to effectuate a permanent placement for the child within 24 months after the date of initial placement.

**24.** In *In re Damon M.*, 362 Md. 429, 436, 765 A.2d 624, 627–28 (2001), we explained the role of a permanency plan:

The permanency plan is an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement. It provides the goal toward which the parties and the court are committed to work. It sets the tone for the parties and the court and, indeed, may be outcome determinative. Services to be provided by the local social service department and commitments that must be made by the parents and children are determined by the permanency plan. And, because it may not be changed without the court first determining that it is in the child's best interest to do so, the permanency plan must be in the child's best interest. These are the

tion for a hearing, the Department of Health and Human Services is statutorily required to develop and implement a permanency plan that is in the best interests of the child pursuant to Section 5–525(b)(2) [25] of the Family Law Article and to provide all parties and the court with a copy of the plan at least 10 days before any scheduled disposition, permanency planning, or review hearing. Sections 3–823(d) and 3–826(a) of the Courts and Judicial Proceedings Article. In the present case, there is no challenge to the fact that the Department satisfied all preconditions and distribution requirements of the reports by timely filing its permanency plan reports on March 21, 2008, June 13, 2008, and July 16, 2008, and by providing copies to the court and all parties at least 10 days before the April 15, 2008, permanency planning hearing and 10 days before the September 26, 2008, permanency planning review hearing, nor does Mr. B. challenge the fact that the Departmental Report was admissible under the statutory scheme.[26]

In addition to the departmental reports, other studies "concerning the child, the child's family, the child's environment, and other matters relevant to the disposition of the case" may be required by the court pursuant to Section 3–816(a) [27] of the

---

reasons, no doubt, that the court is charged with determining the plan and with periodically reviewing it, evaluating all the while the extent to which it is being complied with.

**25.** Section 5–525(b)(2) of the Family Law Article, Maryland Code (1984, 2006 Repl. Vol., 2008 Supp.) provides:

(b) *Duties of Administration.*—In establishing the out-of-home placement program the Administration shall:

\*       \*       \*

(2) concurrently develop and implement a permanency plan that is in the best interests of the child.

**26.** At oral argument, Mr. B.'s counsel noted that there was a stipulation as to admissibility, and both parties agreed that the documents would be allowed in to evidence.

**27.** Section 3–816(a) of the Courts and Judicial Proceedings Article provides:

(a) *Study authorized.*—After a petition is filed under this subtitle, the court may order the local department or another qualified agency to make or arrange for a study concerning the child, the child's family,

Courts and Judicial Proceedings Article, and are admissible as evidence at a dispositional hearing, so long as the report of the study is filed and provided to all parties at least 5 days before the hearing. Section 3–816(c) of the Courts and Judicial Proceedings Article; *see also* Rule 11–105.[28] In the present case, the juvenile court ordered an evaluation of Faith, Mr. B., and Faith's foster parents by the Lourie Center. The Lourie Center Report was filed on July 16, 2009, at least 5 days before the September 26, 2009, permanency planning review hearing, and was provided to all parties. Again, the Lourie Center Report was appropriately admitted into evidence; Mr. B. does not challenge its admissibility.[29]

In the present case, not only were the reports admissible but Mr. B. never raised any objection regarding the admissibility of the documents, including any challenges to their authenticity under Rule 5–901,[30] hearsay under Rule 5–802,[31] nor their inclusion of possible inadmissible opinions

---

the child's environment, and other matters relevant to the disposition of the case.

28. Rule 11–105 provides in pertinent part:
   b. **Use of report.** The report of examination is admissible in evidence as set forth in Section 3–818 of the Courts Article.

29. Mr. B. specifically challenges the use of the Lourie Center Report after being admitted, because the report contained statements of his ex-wife and unknown individuals. This hearsay argument of inadmissible opinion was never raised prior to the admission of the report so that the report could be considered in its entirety, with whatever weight the trial court afforded it. Mr. B.'s citation of *State v. Brooks*, 148 Md.App. 374, 812 A.2d 342 (2002), does not add substance to his argument that after the report was admitted, he was entitled to hold the Department to the task of producing live testimony. *Brooks* stands for the long-standing proposition that trial judges have the prerogative "to weigh the evidence and to assess the credibility of witnesses"; a statement to which we adhere in this opinion.

30. Rule 5–901 provides:
   (a) **General provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

31. Rule 5–802 provides:

under Rules 5–702[32] and 5–703.[33]  When the reports were admitted into evidence, they became available for consideration for any purpose and could be accorded any weight by the court, depending on any extrinsic challenge of reliability by admission of other evidence.  *See Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 495 A.2d 348 (1985); *Haile v. Dinnis*, 184 Md. 144, 40 A.2d 363 (1944).

Mr. B., however, argues that the Department was required to offer live testimony in addition to the reports because otherwise the judge had "no opportunity to assess the credibility and demeanor" of the proponents of the reports and could not accord them their proper weight.  Mr. B. argues that he was disadvantaged because "the court presupposed that all of the conclusions reached in the written reports would have been supported by the Department's direct evidence, without any contradictions, memory lapses, or corrections."  He also contends that he was prejudiced and that the "burden was shifted from the Department to prove the facts they wished to have admitted into evidence to the Appellant to disprove their

---

Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible.

**32.**  Rule 5–702 provides:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue.  In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

**33.**  Rule 5–703 provides in pertinent part:

(a) **In general.**  The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

*    *    *

(c) **Right to challenge expert.**  This Rule does not limit the right of an opposing party to cross-examine an expert witness or to test the basis of the expert's opinion or inference.

occurrence, or lack thereof." The State conversely asserts that the Department is not required to present live testimony and that the reports satisfied its burden of proof and that the burden was not inappropriately shifted to Mr. B.

Mr. B. has no cause to complain for many reasons: he never challenged the reliability of the reports for authenticity, hearsay, or inadmissible opinions; Mr. B. had the reports for at least two months prior to the hearing; and he was offered the opportunity to cross-examine the reports' authors, which he took. Mr. B. cites no authority that requires live testimony in addition to the reports to support their reliability. He also cites no authority for the proposition that his due process rights require that live testimony be offered by the Department or that a certain mode of trial be followed, according to his dictates.

Mr. B. had the opportunity to call other witnesses and to challenge the reliability of the reports.[31] The judge even noted that he was "not stopping [Mr. B.] from presenting any relevant or admissible evidence that [he wanted]. Present away." Here, the Department's reports were admitted into evidence, but Mr. B. chose not to present testimony to demonstrate weakness or error in the Department's reports. He offered and had accepted into evidence various exhibits which the judge read.

Mr. B. cites to *Atkinson v. State*, 331 Md. 199, 627 A.2d 1019 (1993), to support his contention that the Department

---

**34.** Mr. B. contends that *Wilson v. State*, 345 Md. 437, 693 A.2d 344 (1997), and *Void v. State*, 325 Md. 386, 601 A.2d 124 (1992), support his argument that the Department needed live testimony in lieu of the reports. In *Wilson*, however, a trial judge denied the defendant the opportunity to put on testimony of a witness who he had subpoenaed, but who did not show up at trial, because the judge refused to issue a body attachment; we held that the trial court had erred because the defendant had the right to call witnesses on his behalf. Similarly, in *Void*, we held that a trial court erred when it quashed a defendant's subpoenas for three witnesses, without having a proffer of their testimony to determine relevancy. In the present case, Mr. B. was afforded the opportunity to call his own witnesses and present any relevant or admissible evidence.

had to forgo the presentation of its case-in-chief by the admission of its report and the Lourie Center Report and submit in-person testimony. His reliance on *Atkinson* is misplaced, because in that case we found the evidence of physical control of a vehicle in a DWI case offered as a stipulation to be insufficient to sustain a conviction. The case does not stand for the proposition that a stipulated set of facts would not be sufficient to sustain a conviction in other cases, or that testimony was required in addition to the stipulation.

Judge Rubin did not err in admitting the reports into evidence, and there is no authority that requires the Department to present its case-in-chief through live testimony or to augment its documentary evidence with live testimony, after admission. We can find no case or statute, which supports Mr. B.'s theory. That the judge agreed with the reports filed by the Department and the Lourie Center did not obviate Mr. B.'s due process rights—he was afforded a fair process but not guaranteed the outcome he wanted.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**