996 A.2d 907

**Joe Henry RANDOLPH**

v.

**STATE of Maryland.**

**No. 0503, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

June 2, 2010.

124

Celia Anderson Davis (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Sarah P. Pritzlaff (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: ZARNOCH, WRIGHT, and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

CHARLES E. MOYLAN, Jr., J., Retired, Specially Assigned.

Across the scorched earth of Maryland Rule of Procedure 4–215, the appellant, Joe Henry Randolph, and no less than three judges of the Circuit Court for Montgomery County waged a four-month war of attrition between November 10, 2008 and February 18, 2009. On February 19, 2009, a jury, presided over by Judge Ronald B. Rubin, found the appellant guilty of first-degree escape. He was sentenced to a term of eight years imprisonment. The appellant would now like to refight the war of 4–215. On this appeal, he contends

1. that the trial court erroneously permitted him to discharge counsel without punctilious compliance with Rule 4–215;

2. that he was denied his Sixth Amendment right to compulsory process when the court erroneously failed to insure that two of his subpoenas for documents were honored;

3. that the court erroneously instructed the jury on the law of escape; and

4. that the court erroneously denied his request for a jury instruction on the defense of necessity.

### An Amalgam of Subsections 4–215(e) and 4–215(d)

■ The appellant's flagship contention is that because of a breach in the Maginot Line of Rule 4–215 he was forced to go to trial on February 18, 2009, without the benefit of counsel. As is common with long-range struggles, the nature of the conflict seemed to evolve, over time, from one initially concerning the discharge of counsel pursuant to subsection 4–

215(e) into one involving waiver by inaction pursuant to subsection 4–215(d). We will try to deal with the totality of the metamorphosis.

## Judge Weinstein on November 10, 2008

It was on October 3, 2008, that Administrative Judge Ann S. Harrington set the appellant's first scheduled trial date for November 10, 2008, before Judge Paul Weinstein. Until that point, the appellant had been represented by the Montgomery County Public Defender's Office. At the very outset of the proceedings on November 10, however, the appellant stated that he had fired his assistant public defender, Adam Harris. Judge Weinstein immediately pointed out that the unilateral decision of the appellant in that regard was not the official decision of the court.

THE COURT: I'm not going to let him, you can take it up with the trial judge, but I'm not going to let him go, *I'm not going to let you fire him.*

MR. RANDOLPH: *I already fired him,* I mean, a while ago in my case.

THE COURT: *You may have fired him, but the Court didn't fire him.* December 3rd for trial.

(Emphasis supplied).

At the suggestion of the prosecutor, Judge Weinstein then conducted what the parties referred to as a waiver hearing. The subject of a waiver of the right to counsel by the act of discharging counsel is covered by Rule 4–215(e), which provides:

(e) *Discharge of counsel—Waiver.* If a defendant requests permission to discharge an attorney whose appearance has been entered, the court shall permit the defendant to explain the reasons for the request. *If the court finds that there is a meritorious reason for the defendant's request,* the court shall permit the discharge of counsel; continue the action if necessary; and advise the defendant that if new counsel does not enter an appearance by the next scheduled trial date, the action will proceed to trial

with the defendant unrepresented by counsel. *If the court finds no meritorious reason for the defendant's request,* the court may not permit the discharge of counsel without first informing the defendant that the trial will proceed as scheduled with the defendant unrepresented by counsel if the defendant discharges counsel and does not have new counsel. If the court permits the defendant to discharge counsel, it shall comply with subsections (a)(1)-(4) of this Rule if the docket or file does not reflect prior compliance.

(Emphasis supplied).

It is a curiously drawn subsection that uses a lot of words to make what purports to be an important distinction without any truly significant difference. The common denominator threshold is that if the defendant requests the judge's permission to discharge counsel, he must "explain the reasons for the request." The heart of the subsection then contrasts 1) the finding of "a meritorious reason for the defendant's request" with 2) the finding of "no meritorious reason." With one minor difference, the judge, in either event, has to do almost precisely the same thing. The meritorious reason and the non-meritorious reason produce essentially the same result:

| MERITORIOUS REASON | NO MERITORIOUS REASON |
| --- | --- |
| 1. Advise defendant of risk of going to trial unrepresented | 1. Advise defendant of risk of going to trial unrepresented |
| 2. Grant a continuance, if necessary | |

Presumably in the non-meritorious scenario, the defendant could theoretically be forced to go to trial immediately. In either situation, however, there must be compliance with subsection (a)(1)-(4) of the Rule. In this case, it seems clear that Judge Weinstein did not find any meritorious reason for the appellant's request. Because the trial was not going forward on that day in any event, that finding made absolutely no difference. The warning about the possibility of having to go to trial without a lawyer had to be given in either event. Compliance with subsection (a)(1)-(4) had to be effected in either event. Subsection (e) does seem to be unnecessarily bloated.

Although the meritorious versus non-meritorious character of the appellant's request appears to be inconsequential, it was apparent that there was bad blood between the appellant and the assigned assistant public defender dating back to an earlier case where the appellant had fired him as his lawyer. There were also claims that the lawyer had not done all of the things the appellant asked him to do in the present case.

THE COURT: I'm not going to let your fire your lawyer.

MR. RANDOLPH: Excuse me. The reason I said that, *I had him for other cases where I had fired him and we had never got along on terms on other cases,* and in this case, too, I told him I didn't have (unintelligible) for my case. He came to me and we talked and I said, listen, you not, *all this stuff I asked him to do* for me, *he never done it.* And *the stuff I asked him to do this time, he still hasn't done it for me.*

THE COURT: Who is going to represent you?

MR. RANDOLPH: *He's not going to represent me because he's not in my best interest.* I mean, he's a good and competent lawyer, but *he hasn't done the things that I asked him, and the things that I asked him to get for this Court* so I could present mitigating factors.

THE COURT: What did you ask him to do?

MR. RANDOLPH: *I asked him to get some stuff from PRC. I asked him subpoena my records from PRC,* actually my medical records so I said if I'm going with disposition, I need to present my evidence to the judge also and my facts. *He hasn't done none of that. He says that he did it but nobody got back to him but I'm pretty sure, these people told me that they haven't even talked to him.*

(Emphasis supplied).

The assistant public defender, interjecting, insisted that he had complied with the appellant's requests and had communicated with the appellant.

[THE COURT]: But I'm telling you, you have a trial date and you're not getting a continuance.

A I mean, I don't even know, why can't I get a continuance, I mean, I don't even have no paperwork, no nothing. How can I even go, *this is my first time I've ever seen an indictment* and I can't even get a continuance.

Q Well, *you knew what you were charged with, you just told me.*

A *I knew what I was charged with,* but I kept asking for my discovery, my paperwork and trying to get subpoenas and he hasn't done any of that.

Q Well, *he just told me he gave it to you.*

A *He didn't.*

THE WITNESS: *When did you give me discovery, what date?*

MR. HARRIS: *I mailed the discovery and I subpoenaed the people that you wanted to.*

THE WITNESS: You mailed it, now he mailed it to me, *first he handed it to me, now he mailed it. He doesn't even know what he did.* I mean, this, I'm the one who's going to have to do this time. This is my, you know what I'm saying, I'm the defendant.

(Emphasis supplied).

### Compliance With Subsection (e) Generally

■ Before we get to compliance with subsection (a)(1)-(4), subsection (e) generally expressly required the following in the appellant's case.

If the court finds no meritorious reason for the defendant's request, the court may not permit the discharge of counsel without first informing the defendant that the trial will proceed as scheduled with the defendant unrepresented by counsel if the defendant discharges counsel and does not have new counsel.

Judge Weinstein fully satisfied that requirement.

BY THE COURT:

Q All right. *I'm telling you now that if you fire him, you're going to represent yourself.*

A Okay. So I can represent myself at the disposition hearing also?

Q Disposition hearing, that's right now.

A Can I, I can represent myself, at this hearing too, also?

Q Well, you can tell me anything you want to. I'm not going to make a decision to let you fire him yet.

A Okay.

Q *I want you to listen to what I'm telling you.*

A Uh-huh.

Q *Do you understand that you have a right to a lawyer?*

A *Yes, I do.*

Q *You have a lawyer that was appointed by the Public Defender. If you fire him, they're not going to give you another lawyer.*

A *I know that.*

Q You do have a right, if you have money, to hire a lawyer.

A I have money, but they won't release my money from the police station. I have money, I have money, but I've been trying to get it.

Q I don't have any, *I'm just telling you what your rights are.*

A Okay.

Q And *I want to point out that it's dangerous for you to represent yourself because as a lawyer, he knows a lot more how to protect your interest and how to defend you than you do. Okay.*

A He may know that, but he's not in my best interest.

Q All right. I'm just—

A Okay.

Q *Listen to me.*

A All right.

Q *You're ultimately going to make the decision as to what you want to do.*

A Right.

Q But I'm tell[ing] you, *you have a trial date and you're not getting a continuance.*

(Emphasis supplied).

As of that hearing of November 10, if not before, the appellant was apprised of the fact that he had a scheduled trial date of December 3, 2008.

BY THE COURT: All right. You have indicated that you want to fire Mr. Harris, is that right?

A Yes.

Q *Do you understand you have a trial date on December 3rd?*

A No, I did not, I never had, I never had no paperwork. *I don't know nothing,* I've never seen an indictment, I don't know if I can, *you waived my indictment, right, waived my preliminary hearing?*

MR. HARRIS: *No.*

THE WITNESS: I mean, I didn't see no paperwork or nothing, *I don't know nothing.* I don't know nothing about my trial date, anything. *It's the first I'm hearing about the trial date on December 3rd.*

MR. HARRIS: *I sent Mr. Randolph a letter on October 6th.*

THE WITNESS: *Never got it.*

MR. HARRIS: *To the detention center indicating that his trial date was December 3rd.*

(Emphasis supplied).

At the end of the hearing on November 10, Judge Weinstein did not find that there was "a meritorious reason for the defendant's request" to fire his attorney. Indeed, Judge Weinstein had throughout the hearing consistently manifested his displeasure with the appellant's request and his extreme reluctance to grant it. In the face of the appellant's adamant insistence that he would not be represented by Mr. Harris but

would represent himself, however, Judge Weinstein had no realistic choice but to acquiesce in the inevitable.[1]

---

1. In the circumstances of this case, it is hard to imagine how Judge Weinstein could have forced counsel upon the appellant without doing violence to the appellant's constitutionally guaranteed right to self-representation. In *Brye v. State*, 410 Md. 623, 634, 980 A.2d 435 (2009), Judge Harrell referred to the at-times uneasy coexistence within the Sixth Amendment of two sometimes conflicting rights.

> The right of a defendant in a criminal case to counsel is guaranteed by the Sixth Amendment to the United States Constitution.... The right to counsel seeks to protect a defendant from the complexities of the legal system and his or her lack of understanding of the law.
> *Defendants*, however, *have the corresponding right to proceed without the assistance of counsel.*

(Emphasis supplied). See also *Gregg v. State*, 377 Md. 515, 548, 833 A.2d 1040 (2003) ("[T]he Sixth Amendment ... grants the accused not only the right to be represented by counsel, but also the right to make his own defense *without* the assistance of counsel.").

What Judge Harrell called a "corresponding right," the Supreme Court has referred to as a "correlative right." In *Faretta v. California*, 422 U.S. 806, 835–36, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court made it clear that an overly zealous protection of the right to counsel should not manifest itself in diminished protection for the corresponding or correlative right to self-representation.

> Here, weeks before trial, *Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel.* The record affirmatively shows that *Faretta was literate, competent, understanding, and that he was voluntarily exercising his informed free will.* The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the "ground rules" of trial procedure.....
> *In forcing Faretta,* under these circumstances, *to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense.*

(Emphasis supplied).

The caselaw, to be sure, favors the right to counsel and, therefore, insists upon an intelligent and voluntary waiver of it before the corresponding right to self-representation will be recognized. In implementing this favor, however, a sensitive balancing is called for. To go overboard in one direction inevitably sends a chilling message in the other direction. The bonds circumscribing the waiver of the right to counsel should not be drawn so tight that they choke the life out of the right to self-representation. The overly excessive, if not indeed obsessive, protection of one right can end up doing violence to a corresponding right. An insightful sensitivity to this need for balance was shown by the dissenting opinion of Judge Murphy in *Brye v. State*, 410 Md. at 644–45, 980 A.2d 435.

THE COURT: Mr. Harris' appearance is stricken at the request of the defendant. Trial date December 3rd. Mr.

*Faretta v. California,* 422 U.S. at 835, 95 S.Ct. 2525, established the sensitive border line between the competing constitutional rights at the classic waiver standard of *Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). That is the line beyond which the court may not stray in either direction without violating one or the other of the correlative rights. The Court of Appeals recognized the critical importance of this dividing line in *State v. Brown,* 342 Md. 404, 414, 676 A.2d 513 (1996):

> If the defendant requests dismissal of counsel in order to proceed *pro se,* and if the proposal to discharge counsel is timely and unequivocal, the court must ordinarily grant the request. *Faretta.* ... Although courts have recognized several exceptions to the *Faretta* rule, these *exceptions have been narrowly construed to effectuate the defendant's right to self-representation.* Absent a recognized exception, *refusal to grant a timely unequivocal request for self-representation is reversible error.*

(Emphasis supplied).

At least twice, however, the Court of Appeals has acknowledged that its interpretation of Rule 4–215 is deliberately tilted in favor of the right to counsel. *State v. Wischhusen,* 342 Md. 530, 543 n. 10, 677 A.2d 595 (1996) ("Rule 4–215 imposes requirements that exceed constitutional standards."); *Richardson v. State,* 381 Md. 348, 367 n. 11, 849 A.2d 487 (2004) ("It is important to note that Rule 4–215 imposes requirements that exceed constitutional standards."). To provide extra protection for the right to counsel is, *ipso facto,* to reduce protection for the correlative right to self-representation. In *Muhammad v. State,* 177 Md.App. 188, 244, 934 A.2d 1059 (2007), *cert. denied,* 403 Md. 614, 943 A.2d 1245 (2008), this Court explained:

> With respect to such excess coverage, it is clear that a defendant who wishes to represent himself and who has satisfied *Faretta, Johnson v. Zerbst,* and *Adams* [*v. United States ex rel. McCann,* 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942)] but who has failed to satisfy one of the non-constitutional provisions of Rule 4–215 could be denied his constitutional right to *pro se* representation if the rule of court were permitted to "trump" the constitutional principle. *It is inconceivable that the Supreme Court would countenance such a thumb on the scales of its finely calibrated balancing.*

(Emphasis supplied).

Indeed, an alternative holding in *Muhammad v. State,* 177 Md.App. at 246, 934 A.2d 1059, was that such a tilting of the scales would be unconstitutional:

> Our alternative holding with respect to this contention would be that *if a provision of Rule 4–215 were violated and that provision were in excess of the constitutional requirements for an effective waiver, that provision* of the rule *would not be permitted to stand* against what would otherwise be an entitlement to the Sixth Amendment right to self-representation *according to established constitutional criteria.*

(Emphasis supplied).

Harris is ordered by the Court to give a copy of his file to Mr. Randolph.

MR. HARRIS: I'll provide it today, Your Honor.

### Compliance With Subsection (a)(1)-(4)

Subsection (e), dealing with the discharge of counsel, concludes with the direction:

If the court permits the defendant to discharge counsel, it shall comply with subsections (a)(1)-(4) of this Rule if the docket or file does not reflect prior compliance.

Turning to subsection (a), requirement (a)(4) is not pertinent to the situation before us and requires no discussion. The other three requirements are applicable. Subsection (a)(1)-(3) provides, in pertinent part:

[T]he court shall:

(1) Make certain that the defendant has received a copy of the charging document containing notice as to the right to counsel.

(2) Inform the defendant of the right to counsel and of the importance of assistance of counsel.

(3) Advise the defendant of the nature of the charges in the charging document, and the allowable penalties, including mandatory penalties, if any.

### A. Subsection (a)(1):

■ The satisfaction of subsection (a)(1) is very different from the satisfaction of (a)(2) or (a)(3). This Court discussed the difference in *Broadwater v. State,* 171 Md.App. 297, 304, 909 A.2d 1112 (2006), *aff'd,* 401 Md. 175, 931 A.2d 1098 (2007).

With respect to the three absolute requirements, *the first is, essentially, the court's confirmation that someone delivered to the defendant "a copy of the charging document containing notice as to the right to counsel."* The second and third requirements, concerning, respectively, 1) "the right to counsel" and "the importance of assistance of counsel" and 2) "the nature of the charges" and the "allow-

able penalties," are actual advisements that must be made by the judge personally to the defendant on the face of the record. *Some appreciation of the different natures of these three (or four or five) requirements will make an application of a sometimes overly generalized caselaw more sensitively possible.*

(Emphasis supplied).

What is required to satisfy (a)(2) or (a)(3) is not required for the satisfaction of (a)(1). Our *Broadwater* opinion went on, 171 Md.App. at 325, 909 A.2d 1112:

It would not, however, apply to requirement # 1, by which the court only seeks information about an event (the delivery of a copy of the charging document). *The recipient of information pursuant to requirement # 1 is the judge, not the defendant.* The requirement is that *"the court shall make certain"* that the event (the delivery of the charging document) *had* at some earlier time *actually taken place. This is not part of a message being aimed at the defendant.*

(Emphasis supplied).

We also noted the distinction between (a)(1), on the one hand, and (a)(2) and (a)(3), on the other hand, in *Muhammad v. State,* 177 Md.App. 188, 248, 934 A.2d 1059 (2007), *cert. denied,* 403 Md. 614, 943 A.2d 1245 (2008).

As we focus in on subsection (a)(1), *it is important not to treat all of the provisions of Rule 4–215 the same but to recognize the fundamental difference,* in terms of essential character, *between subsection (a)(1), which concerns the happening of an event, and most of the other provisions* of Rule 4–215, *which involve the actual and direct imparting of specific information by the judge to the defendant.*

(Emphasis supplied).

At the hearing on November 10, the discussion among Judge Weinstein, the appellant, and Assistant Public Defender Harris covered a wide range of papers, documents, subpoenas, and discovery. In the course of the discussion, the appellant denied everything that Mr. Harris informed the court that he had done.

THE COURT: Have you obtained, has he received a copy of his indictment?

MR. HARRIS: I don't know, I'd have to go through the file. I met with Mr. Randolph before this, *I've provided him with discovery and I've issued subpoenas to the parties that he's asked me to issue subpoenas to.*

THE WITNESS: I never received any, *he never gave me no discovery. I haven't had any of the indictment papers, and he hasn't issue any subpoenas at all, he hasn't done anything on my case.*

(Emphasis supplied).

At the end of the discussion, the appellant was assured that he would receive copies of everything Mr. Harris claimed he had earlier provided:

BY THE COURT:

Q You have about a month.

A So I got about a month.

MR. HARRIS: That's what he's saying.

BY THE COURT:

Q And *I'm going to order Mr. Harris to give you another set of the discover[y].*

A *He never gave me the first set.*

MR. HARRIS: *I'll be happy to send a copy.*

BY THE COURT:

Q *You just told me you didn't get it, but you're going to get it this time.*

A *Okay.*

Q *Because it's going to be hand carried to you.*

(Emphasis supplied).

As the hearing of November 10 came to an end, Judge Weinstein's final directive was:

THE COURT: Trial date December 3rd. *Mr. Harris is ordered by the Court to give a copy of his file to [the appellant].*

MR. HARRIS: *I'll provide it today, Your Honor.*

(Emphasis supplied).

Although this colloquy, to be sure, did not use the magic word "indictment" or "charging document," the record itself establishes that the appellant was actually given a copy of his indictment. On the scheduled trial date of December 3, 2008, he appeared before Judge Harrington and made the following acknowledgment:

THE COURT: Are you Mr. Joe Henry Randolph?

MR. RANDOLPH: Yes, ma'am.

THE COURT: Okay. Mr. Randolph, today is the trial date in your case and *you are charged by . . . indictment in one count with escape in the first degree* on or about June 11, 2008. *Have you received a copy of the indictment?*

MR. RANDOLPH: *Yes, I did.*[2]

(Emphasis supplied).

That acknowledgment of December 3 established that subsection (a)(1) had been satisfied. With respect to the nature of the proof required to show compliance with (a)(1), we observed in *Muhammad v. State,* 177 Md.App. at 249–50, 934 A.2d 1059:

Subsection (a)(1), unlike the other provisions, involves only the objectively measured question of whether "the defendant received a copy of the charging document containing notice as to the right to counsel."

As *Fowlkes v. State,* 311 Md. 586, 609, 536 A.2d 1149 (1988), makes clear, *the satisfaction of subsection (a)(1)*

---

2. By way, perhaps, of carrying coals to Newcastle, we also note that the indictment was filed September 11, 2008. The case file also contains a Record of Service from the Montgomery County Sheriff's Office, attesting that the charging documents were served on the appellant at the Montgomery County Correctional Facility on October 16, 2008, at 11:05 A.M. There is also in the file an Initial Appearance Report in the District Court informing the appellant of the charge against him and expressly advising him, on two separate pages, of his entitlement to an attorney, including explicit instructions for contacting the Office of the Public Defender. Both pages are signed by the appellant and dated August 15, 2008.

*does not require a judge to make inquiry of, or say anything to, a defendant in a courtroom. If evidence objectively establishes that the defendant actually received a copy of the charging document,* moreover, *the fact that the judge failed to "make certain" of that fact is immaterial. The very occurrence of receiving the document speaks for itself and ipso facto satisfies the subsection.* The holding in this regard of *Fowlkes v. State* was unequivocal.

As to subsections (1)(1)-(3), the record contains a copy of the charging document in the defendant's case. *This document,* which bears the defendant's signature, *contains a notice of the right to counsel;* therefore, *this document demonstrates compliance with subsection (a)(1).*

311 Md. at 609 [536 A.2d 1149] (emphasis supplied).

. . . We cite *Fowlkes* for the threshold proposition that *if extrinsic evidence is legally sufficient to support a finding that the defendant indeed received a copy of the charging document, adequate compliance with subsection (a)(1) has been shown.* Whether the judge himself did or did not do something or other in the courtroom is a redundant technicality.

(Emphasis supplied).

## B. Subsection (a)(2):

 Subsection (a)(2) requires that the judge personally advise the defendant of 1) the right to counsel and 2) the importance of the assistance of counsel. Judge Weinstein personally advised the appellant in both regards. At one point early in the hearing, the exchange was:

THE COURT: I want you to listen to what I'm telling you.

A Uh-huh.

Q *Do you understand that you have a right to a lawyer?*

A *Yes, I do.*

(Emphasis supplied).

A few questions and answers later in that same exchange, Judge Weinstein further advised the appellant:

I want to point out that *it's dangerous for you to represent yourself because* as *a lawyer,* he *knows a lot more [about] how to protect your interest and how to defend you than you do.* Okay?

(Emphasis supplied).

Subsection (a)(2) was satisfied.

## C. Subsection (a)(3):

■ Subsection (a)(3) required Judge Weinstein to advise the appellant with respect to 1) the nature of the charge and 2) the allowable penalties. As to the nature of the charge, the following exchange took place.

THE COURT: *Do you know what you're charged with?*

A. *I'm charged with first-degree felony escape.*

Q. Right.

(Emphasis supplied).

A short time later when the appellant complained that that day, November 10, was "my first time I've ever seen an indictment," the appellant acknowledged knowing what he had been charged with.

Q Well, *you knew what you were charged with, you just told me.*

A *I knew what I was charged with,* but I kept asking for my discovery, my paperwork and trying to get subpoenas and he hasn't done any of that.

Q Well, he just told me he gave it to you.

A He didn't.

(Emphasis supplied).

A little further along in the hearing, Mr. Harris briefly summarized the nature of the case and the nature of the defense for the appellant's benefit.

THE COURT: Tell him what you told me.

MR. HARRIS: What I represented to the Court was that *the escape came in the course of a moment of panic,* that it was, that *there were mental health issues that fed into that briefly considered decision* and that *no one was hurt* in this case and that *the conduct that's alleged doesn't justify a sentence of seven years.* That was my argument to the Court.

(Emphasis supplied).

In explaining to Judge Weinstein at one point why he would not agree to a plea bargain resulting in a sentence of seven years, the appellant demonstrated a clear understanding of what was being charged.

Q Tell me what you want to say.

A *I wanted to tell you about the facts of the case and why I don't think I should get seven years.*

Q I understand what the facts were.

A You understand.

Q *The allegation* is that you walked off from the Pre-Release Center.

A *Allegation.*

Q *Okay. They have to prove it.*

A *Right.*

(Emphasis supplied). The appellant was advised of and fully understood the nature of the charge.

The maximum penalty for the felony of first-degree escape is ten years imprisonment. There are no mandatory provisions. In the course of a longer discussion as to why the appellant would not accept a plea bargain resulting in a seven-year sentence, Judge Weinstein informed the appellant that upon a verdict of guilty without a plea bargain, he would be inclined to impose a sentence of nine years. In the course of the discussion, moreover, Judge Weinstein expressly informed the appellant that the maximum penalty for first-degree escape was ten years imprisonment.

Q Ms. Armstrong, who is the prosecutor, has made you an offer. Mr. Harris has told me he conveyed that offer to you.

A He told me they offered me seven years.

Q Seven years.

A They said you was going to give me—

Q You don't have to accept it.

A I didn't want to.

Q And I'm not suggesting you accept it, because if you do accept it, you have to tell me it's voluntary.

A I'm not going to accept seven years.

Q All right. Then you have a right to go to trial. *The maximum penalty that you can receive is 10 years. You understand that?*

(Emphasis supplied).

The appellant was thus fully informed as to the maximum penalty he was facing. In all respects, subsections (a)(1)-(3) were fully complied with.

### Judge Harrington on December 3, 2008

The appellant has chosen to argue this contention exclusively in terms of Rule 4–215(e), dealing with the discharge of counsel. His narrow analysis of events ends with the hearing of November 10, 2008. The saga of the appellant and Rule 4–215, however, did not end on November 10. Because of a heroic effort by the Circuit Court for Montgomery County to insure that the appellant enjoyed every constitutional protection to which he was entitled, the story did not end with a scheduled trial of the appellant on December 3, 2008. There was instead an extended pretrial hearing on that day in front of Judge Harrington, in which the entire panoply of warnings and advisements were bestowed on the appellant all over again.

In contrast to the appellant, who chooses to remain doggedly entrenched in 4–215(e), the State argues that the supervening post-December 3 reality is that the appellant's ultimate

trial without counsel on February 18–19, 2009, was a product of a 4–215(d) waiver by inaction in the circuit court. The position of the State is that what began as a subsection (e) discharge of counsel segued or metamorphosed, post-December 3, into what then became a subsection (d) waiver by inaction. In pertinent part, subsection (d) provides:

If a defendant appears in circuit court without counsel on the date set for ... trial, indicates a desire to have counsel, and the record shows compliance with section (a) of this Rule ... in a previous appearance in the circuit court ... the court shall permit the defendant to explain the appearance without counsel. If the court finds that there is a meritorious reason for the defendant's appearance without counsel, the court shall continue the action to a later time and advise the defendant that if counsel does not enter an appearance by that time, the action will proceed to trial with the defendant unrepresented by counsel. If the court finds that there is no meritorious reason for the defendant's appearance without counsel, the court may determine that the defendant has waived counsel by failing ... to obtain counsel and may proceed with the ... trial.

The ultimate issue, of course, is whether the appellant, when he ultimately went to trial without a lawyer on February 18, 2009, was unconstitutionally denied his Sixth Amendment right to the assistance of counsel. Looking back from February 18, 2009, we resist the notion that our analysis must be confined either to a hermetically sealed subsection 4–215(e) or to a hermetically sealed subsection 4–215(d), with no leakage between the two. As we assess the collective effort of the Circuit Court for Montgomery County to follow the law, the totality of circumstances necessarily includes both the hearing before Judge Weinstein on November 10 and the hearing before Judge Harrington on December 3.

If we were looking only at subsection 4–215(e), the appellant would have been tried, without a lawyer, on December 3, 2008. As of the hearing of November 10, he was, indeed, scheduled for trial on December 3. On December 3, however, no such trial took place. As Judge Harrington introduced the pro-

ceedings, she noted that what was on her docket was a trial with a "self-represented litigant." The assistant state's attorney indicated that the appellant had fired the public defender who had originally represented him and that he was "going to ask for a continuance today to retain Spencer Hecht." With the acquiescence of the prosecutor, Judge Harrington agreed to a continuance and ultimately settled on a more remote scheduled trial date of February 18, 2009. There followed a discussion about whether Rule 4–215(a) had earlier been satisfied and then a decision to do it again simply as a precaution.

THE COURT: [T]he file doesn't reflect that there's ever been a—

MS. ARMSTRONG: *Judge Weinstein actually did, but I don't think it would hurt to do it again.*

THE COURT: Judge Weinstein did?

MS. ARMSTRONG: He did.

THE COURT: *It just doesn't show it on the docket entries. Oh, yes, it does, Tab No. 30.*

MS. ARMSTRONG: *But I don't think it would hurt to do a complete one.*

THE COURT: *Oh, okay.*

(Emphasis supplied).

In terms of 4–215(d), Judge Harrington explored with the appellant the subject of his representation and heard from him that he hoped to get a privately retained lawyer and, indeed, had the funds to do so.

THE COURT: Now I see that you had Mr. Harris representing you, but right now you don't have an attorney. *Were you going to represent yourself?*

MR. RANDOLPH: *No.*

THE COURT: *What were your plans?*

MR. RANDOLPH: *My plan was to have a lawyer.*

THE COURT: Who are you going to have represent you?

MR. RANDOLPH: Over at the (unintelligible), since it's hard for me, you know, to get in contact with a lawyer, so right now I've just been sending out letters trying to get in

touch with a lawyer. I have no other way to get in contact with a lawyer.

THE COURT: Well, *do you have any family members who can contact attorneys for you?*

MR. RANDOLPH: *Uhn-huh.*

THE COURT: *Do you have funds to hire a lawyer?*

MR. RANDOLPH: *Yes, I do have funds.* I have funds, all my funds when I got locked up—

THE COURT: Okay.

MR. RANDOLPH:—they're at the police station. I need somebody to go pick them up. *So I've been trying to get a lawyer* to see if he can go, I can file a power of attorney *so he can pick my money up and represent me.*

(Emphasis supplied).

Judge Harrington then heard from the appellant as to why he had fired the assistant public defender.

THE COURT: Did you fire Mr. Harris?

MR. RANDOLPH: Yes, I did.

THE COURT: You don't want the assistance of a public defender in this case?

MR. RANDOLPH: The only thing about it, with me and Mr. Harris, I had Mr. Harris on some other cases and we weren't seeing eye-to-eye and I fired him in those other cases. So I figured there was some kind of, some animosity going on. We wasn't seeing eye-to-eye—

THE COURT: Okay.

MR. RANDOLPH:—because I had to fire him in my other case last year and I thought that maybe he had something against me. He wasn't representing me right.

Judge Harrington ascertained that the appellant actually wanted a continuance in order to retain an attorney. She granted him a two-and-one-half month continuance to do just that.

[PROSECUTOR]: Your Honor, *I did have a conversation with Spencer Hecht yesterday.* He indicated that I don't know who *he had been contacted* with, *but that he was*

*trying to see if Rule No. 1 could be taken care of and that he was hoping to get in.* But I don't know what conversations Mr. Randolph has had with him.

MR. RANDOLPH: *I had some, I had some conversations with him. I filed, I signed over a power of attorney with him so he can see if he's going to get my money.*

THE COURT: Okay.

MR. RANDOLPH: *So I am in the process of trying to hire a lawyer.*

THE COURT: Well, what I'm trying to ascertain is, *are you ready for trial right now or are you asking—*

MR. RANDOLPH: *No, I'm not.*

THE COURT:—*to postpone this case?*

MR. RANDOLPH: *I'm asking for a postponement.*

THE COURT: Okay. *And the State does not object to that?*

MS. ARMSTRONG: *No, Your Honor,* but I would put on the record that we are prepared today.

THE COURT: Okay.

MS. ARMSTRONG: We do have all of our witnesses. Most of them are on call.

THE COURT: Okay.

MS. ARMSTRONG: But I understand the difficulty of him going forward without an attorney.

THE COURT: Okay. *Then I will grant Mr. Randolph's postponement. The file is going to reflect that he has been fully advised of his rights to have counsel. I see that Judge Weinstein already did that and Judge Weinstein determined that Mr. Randolph had waived his right to be represented by counsel for today's purposes.*

*But since he is making attempts to have an attorney represent him, I'll grant a postponement [at] his request*

*and set this in for trial on February 18,* 2009, at 9:30 in the morning for two days.

(Emphasis supplied).

In subsection 4–215(d) terms, Judge Harrington had "permit[ted] the defendant to explain the appearance without counsel" and presumably found that there was "a meritorious reason" for it, in that she granted the appellant a continuance. It was then explained to the appellant "that if counsel does not enter an appearance by that time, the action will proceed to trial with the defendant unrepresented by counsel."

MS. ARMSTRONG: And I think it's clear to us, but *just so Mr. Randolph understands, if he comes to Court on February 18th without an attorney, he will go forward without an attorney.*

THE COURT: *Yes. We had marked the file no further postponements.*

MS. ARMSTRONG: *No further Defense postponements?*

THE COURT: *No further postponements.* Everybody stay healthy and...

MS. ARMSTRONG: That doesn't seem fair.

THE COURT:—let's hope it doesn't snow.

(Emphasis supplied).

Although the docket entries showed that Judge Weinstein had fully satisfied the requirements of subsection 4–215(a), Judge Harrington undertook to go through the ritual again.

### A. Subsection (a)(1):

As we have already mentioned, Judge Harrington double-checked on the appellant's receipt of the indictment.

THE COURT: [Y]our are charged by indictment in one count with escape in the first degree on or about June 11, 2008. *Have you received a copy of the indictment?*

MR. RANDOLPH: *Yes, I did.*

(Emphasis supplied).

## B. Subsection (a)(2):

With respect to the right to counsel and the importance of counsel, Judge Harrington's advice was:

Now, you are entitled to be represented by an attorney and I need to advise you pursuant to rule that an attorney could be very helpful to you in the presentation of any defenses that you might have in the preparation of your trial and actually getting witnesses if you have them to appear in Court.

Even if you were ultimately to be convicted of this offense, an attorney could present information which might mitigate a sentence to be imposed.

## C. Subsection (a)(3):

With respect to the nature of the offense, Judge Harrington added to what Judge Weinstein had earlier done.

THE COURT: Okay. And do you understand the charge, the elements of the charge and what it means?

MR. RANDOLPH: Not really.

THE COURT: You don't understand what it means to escape? *It says that you escaped from the Montgomery County Pre–Release Center which was a place of confinement, meaning that you left when you were not authorized to do so. That's what that offense means. Do you understand that?*

MR. RANDOLPH: *Yeah.*

(Emphasis supplied).

On the subject of penalties, Judge Harrington actually supplemented what Judge Weinstein had earlier done. She added a mention of the possible monetary fine, whereas he had limited himself to the possible incarceration.

THE COURT: Okay. This is a felony offense. The maximum statutory penalty is 10 years in jail and/or a $20,000 fine.

### D. Subsection (a)(5):

Whereas the reference of subsection 4–215(e) to subsection (a) is limited to (a)(1)-(4), subsection 4–215(d)'s reference is to all of subsection (a), which includes (5). That's the provision that with the granting of the continuance must come the warning that "if the defendant appears for trial without counsel, the court could determine that the defendant waived counsel and proceed to trial with the defendant unrepresented by counsel." This subprovision of 4–215(a) is redundant with what the general body of 4–215(d) already requires and we have discussed *supra* how it was satisfied.

### Judge Harrington on February 18, 2009

■ From the appellant's point of view, the axe finally fell on February 18, 2009. The case was initially brought before Judge Harrington on that day in her capacity as administrative judge. She learned that the appellant was present without a lawyer, notwithstanding that he had earlier been warned about the consequences. There was no necessity to plow that ground again. Judge Harrington assigned the case to Judge Rubin for trial.

THE COURT: Good morning.

MS. ARMSTRONG: Do the sheriffs have Mr. Randolph?

THE BAILIFF: He's here.

MS. ARMSTRONG: *He's still not represented,* so—

THE COURT: Okay. Is this for trial?

MS. ARMSTRONG: Yes.

THE COURT: Let's find you a home.

MS. ARMSTRONG: I mean should we bring him out and make sure—

THE COURT: I don't think so because they're going to have to take him somewhere else.

MS. ARMSTRONG: I mean I don't know when his—

THE BAILIFF: He's right here, Your Honor. The defendant is standing here at the—

MS. ARMSTRONG: I don't know what his preference is for today.

THE COURT: I'll—

MS. ARMSTRONG: I mean I know we're marked no further.

THE COURT: I'll let it start with someone else.

MS. ARMSTRONG: Okay.

THE CLERK: You have it for two days.

THE COURT: A two-day trial?

MS. ARMSTRONG: Yes.

THE COURT: And *I believe we've advised him repeatedly?*

MS. ARMSTRONG: *Repeatedly.*

THE COURT: *And the file has been marked no further postponements?* So I'll let another judge deal with that for awhile.

THE CLERK: Judge Rubin.

(Emphasis supplied).

### Judge Rubin on February 18, 2009

When the case arrived before Judge Rubin, everything with respect to the appellant's proceeding without counsel had already been concluded. The case proceeded routinely to trial, except that on a number of occasions Judge Rubin gratuitously gave the appellant very helpful legal advice.

THE COURT: ... Good morning, sir, how are you?

MR. RANDOLPH: Fine.

THE COURT: Okay. And your name is?

MR. RANDOLPH: Joe Randolph.

THE COURT: Thank you very much, sir. You can have a seat. All right. This matter has been called for trial. How would you like to proceed?

MS. ARMSTRONG: Your Honor, I guess I don't know whether anyone has ever asked the defendant whether he wishes to proceed by way of a jury or by way of a bench.

THE COURT: Okay.

MS. ARMSTRONG: He has been advised numerous times of his right to counsel.

THE COURT: Well, it doesn't hurt to go over things.

MS. ARMSTRONG: So—

THE COURT: Sir, how are you?

MR. RANDOLPH: Fine.

THE COURT: You have a right, if you wish, to a jury trial. And I'm just inquiring whether you would prefer a jury trial or to have the matter tried to me?

MR. RANDOLPH: I would rather have a jury trial.

THE COURT: Okay. Well, that's absolutely your right. You know it can be a little bit cumbersome if you didn't go to law school, but you do have a right to a jury trial. So if it's a jury trial you wish, it's a jury trial you shall have. May I just give you some ground rules please?

MR. RANDOLPH: Yes.

### Rule 4–215 Concluded

It really does not matter whether we are analyzing subsection 4–215(e), as the appellant would prefer, or subsection 4–215(d), as the State would prefer, for each was independently satisfied. *A fortiori*, the amalgam of the two was doubly satisfied. Anguishing over which particular box gets to be checked is silly. When the appellant went to trial on February 18, 2009, the judges of Montgomery County had fully complied with every requirement of the Sixth Amendment's right to the assistance of counsel, even as implemented and amplified by Maryland Rule of Criminal Procedure 4–215.

### The Escape in a Nutshell

On July 11, 2008, the day of the appellant's escape, he was serving an 18–month sentence in Montgomery County that had begun on December 10, 2007, for an unrelated crime. He

had initially been at the Montgomery County Correctional Facility, a medium security facility where the inmates are literally locked up. Once a prisoner has less than 18 months to serve, however, he becomes eligible for transfer to the Pre–Release Center, an extremely minimal security facility where the inmates enjoy extensive privileges. On April 20, 2008, the appellant was transferred to the Pre–Release Center. On June 11, the supervisory personnel decided that it was necessary to transfer the appellant back to the detention center, at least temporarily.

The appellant, however, did not want to go back to the detention center. When he saw one of the guards approach him with handcuffs for the transport, he suddenly ran out the door, ran down the hall, and fled the building. He claimed that he panicked and never intended to escape. He never turned himself in, however, when the panic attack was over. About five days after his initial flight, the appellant telephoned his case manager at the Pre–Release Center. Although she urged him to turn himself in and informed him that there was a warrant out for his arrest, he deliberately declined to do so. He was ultimately picked up by the police on July 8, 2008, approximately one month after his initial flight.

At trial, the appellant did not contest the State's proof of the *corpus delicti.* His exclusive defense was the he did not have the requisite *mens rea* to escape "knowingly" because he was tired, under stress, and experienced a moment of panic. His direct testimony sums up the entire defense case.

I got up the next morning. I went to work, 4:00 a.m. *I was still tired.* I was still in pain. My chest was swollen. *I was under stress.* I was stressed out, been stressed out for weeks. *I've been stressed out ever since I was over at the Clarksburg facility.*

The next morning, you know, well, after I came back from work, I came back from work around like 11:30. I got back. I went in the room. I laid down, little bit tired. I get up early in the morning. I laid down. I don't be out too much any way. I got a knock at my door, well, not a knock

somebody, *somebody came to my door. It was Mr. O'Malley. Came in and said, "I need you downstairs."* And I asked him, I said, what is it about? He said, "It's nothing. Just come on."

Well, you know, I still had my kitchen uniform on. I just, you know, I followed him. I didn't think nothing was going on. He said come on down the room. *When I came down to the room, I seen two other individuals in the room. And he said, turn around, put your hands up on the wall. I said, put my hands up on this wall? I didn't know what he was doing.* I thought he might wanted to pat me down or something.

Then I, you know, *I looked back and I seen another individual pulling out handcuffs.* When I seen him pull out the handcuffs, you know, I don't know, *I don't know what came over me,* you know. *I just kind of lost all rational ability. I wasn't thinking. And I just bolted. I just ran.* I wasn't thinking, I was, *I think my mind was somewhere else.* All I saw were the handcuffs and, you know, I just lost it, you know. I just wasn't thinking. *My whole rationality* of, you know, discerning what was going on *was out the door.*

*I was already under a lot of stress and I was under duress,* you know. I wish I could have acted or *I wish I could have did something else. But,* like I said, *I was under stress.* And, you know, *sometime when you're under stress you* do things that you don't really, *wouldn't normally do if you wasn't stressed out or under duress.*

(Emphasis supplied).

### Subpoenas and Compulsory Process

■ The appellant contends that his Sixth Amendment right to compulsory process was violated when the trial court failed to ensure that his subpoenas for medical records were honored. With respect to the appellant's medical and emotional condition, the appellant successfully subpoenaed and introduced into evidence his medical records from the Suburban Hospital. He also called as defense witnesses 1) a nurse

practitioner from the Pre–Release Center; 2) a nurse from the Correctional Facility; and 3) his unit manager from the Pre–Release Center. His complaint concerns two subpoenas, one for records from the Pre–Release Center and the other for records from the Correctional Facility. No where in the trial record do we find any express request for Judge Rubin to do anything with reference to these records.

One subpoena was for Patricia Sollock as well as for what the appellant described as "Complete psych report for Joe Randolph and from any other outside agencies." The Sheriff's Office records show that that subpoena was returned "non est" after four attempts at service. The second subpoena about which the appellant complains was for Sylvia Hernandez, as well as certain documents from the Pre–Release Center described in the subpoena as "Complete Prc File including any letters or memo written to staff or team from Joe Randolph." That subpoena was returned "non est" after nine attempts at service. Notwithstanding that, Sylvia Hernandez testified as a witness for the State. She was the case manager at the Pre–Release Center. During the appellant's extensive cross-examination of Ms. Hernandez, he never once inquired about any missing records that she had failed to bring with her. When questioning Evelyn Chun, the community health nurse from the Correctional Facility, moreover, the appellant never inquired about any subpoenaed records from that institution. The present contention is clearly an afterthought.

There was no remote violation of the compulsory process clause in this case. As Judge Wilner stated for the Court of Appeals in *Wilson v. State,* 345 Md. 437, 449, 693 A.2d 344 (1997):

> Nor does the right [to compulsory process] require a court to engage in a manhunt for the missing witness. It is up to the defendant to locate his or her witnesses.

In referring to the Maryland law under the *in pari materia* Article 21 of the Maryland Declaration of Rights (prior to the

incorporation of the compulsory process clause), *Wilson* went on to point out:

> In [*Edmondson v. Brady*, 188 Md. 96, 52 A.2d 96 (1947) ], the appellant, appealing from the denial of his petition for habeas corpus, complained that a witness he had subpoenaed at his trial failed to appear. He gave no reason for the nonappearance and apparently did not ask the court to take any action. *He simply complained about her non-appearance.* We rejected the complaint, holding that *Article 21* "*assures him process for witnesses but does not guarantee attendance of the witnesses.*"

345 Md. at 445–46, 693 A.2d 344 (emphasis supplied). *See also State ex rel. Battee v. Warden,* 191 Md. 751, 752, 60 A.2d 187 (1948); *Copeland v. Wright,* 188 Md. 666, 668, 53 A.2d 553 (1947).

The *Wilson* opinion also stated emphatically that "to establish a violation of the compulsory process clause, the defendant 'must at least make some plausible showing of how [the] testimony would have been both material and favorable to his defense.' " 345 Md. at 448, 693 A.2d 344. Cf. *Whack v. State,* 94 Md.App. 107, 118, 615 A.2d 1226 (1992).

In groping to show materiality, the appellant argues, "If the subpoenas had been properly complied with, and the relevant records obtained, then Appellant may have had a factual basis for entering a plea of not criminally responsible." Aside from the purely speculative nature of the suggestion, there was no plea of not criminally responsible in this case. The appellant goes on, "The pertinent records may also have triggered an inquiry by the trial court to determine Appellant's competency to stand trial under the Criminal Procedure Article, Section 3–104." Competency was not at issue in this case. The appellant concludes, "Finally, the contents of the medical records may have been helpful to establish a defense to the crime of escape." The contention is based on sheer speculation. The appellant was not denied compulsory process.

### Jury Instruction on Escape

■ The appellant contends that Judge Rubin erroneously instructed the jury on the law of escape by adding to the *Maryland Pattern Jury Instructions—Criminal,* 4:11.1 the following additional language:

> *Knowingly means that the defendant knew his actions would result in his leaving the facility without permission.* Even if you find that the defendant was having problems within the facility or institution, *he is not entitled to resort to self help,* but must apply for release or other remedies through proper and regular channels.

(Emphasis supplied).

Although, incidentally, we see nothing wrong with the instruction, the short answer to the contention is that it has not been preserved for appellate review. After initially objecting to the supplemental instruction, the appellant changed tactics, "I don't mind this coming in as long as I can get another instruction saying that stress and duress can be derived from it." Quite independently, Maryland Rule 4–325 provides that unless a party objects after the court has completed its instructions, the issue is not preserved for appellate review. No such objection was forthcoming here. *Thomas v. State,* 143 Md.App. 97, 116, 792 A.2d 368, *cert. denied,* 369 Md. 573, 801 A.2d 1033 (2002); *Burks v. State,* 96 Md.App. 173, 180–81, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993).

### The Defense of Necessity

■ The appellant finally contends that he was erroneously denied a jury instruction on the defense of necessity. At trial he kept talking about duress or necessity, but he has abandoned any argument with respect to duress. As Judge Kenney pointed out for this Court in *Marquardt v. State,* 164 Md.App. 95, 131, 882 A.2d 900 (2005):

> The circuit court need not give the instruction, however, unless the defendant has produced "some evidence" sufficient to give rise to a jury issue on the defense. *Dykes v. State,* 319 Md. 206, 216, 571 A.2d 1251 (1990)....

"Whether the evidence is sufficient to generate the desired instruction is a question of law for the judge." *Roach v. State,* 358 Md. 418, 428, 749 A.2d 787 (2000).

In *Robinson v. State,* 42 Md.App. 617, 402 A.2d 115 (1979), this Court dealt with the defense of necessity in the context of the crime of escape. We quoted with approval from *People v. Lovercamp,* 43 Cal.App.3d 823, 118 Cal.Rptr. 110 (1975), which explained the type of extreme situations which might sometimes excuse an escape on the basis of a truly dire necessity.

"[R]ather early in the legal history of the offense of escape, it became clear that all departures from lawful custody were not necessarily escapes or, to put it more accurately, there was a possible defense to an escape charge, to wit, necessity. In 1 Hale P.C. 611 (1736), it was written that *if a prison caught fire and a prisoner departed to save his life, the necessity to save his life 'excuseth the felony.'* So, too, we may assume that *a prisoner with his back to the wall, facing a gang of fellow inmates approaching him with drawn knives, who are making it very clear that they intend to kill him, might be expected to go over the wall rather than remain and be a martyr to the principle of prison discipline.*"

(Emphasis supplied).

The *Robinson,* opinion went on, 42 Md.App. at 621–22, 402 A.2d 115, to set out the necessary elements for the availability of the necessity defense in an escape case.

*[A] limited defense of necessity* is available to an individual charged with the crime of escape *if the following conditions exist:*

"(1) *The prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future;*

(2) There is no time for a complaint to the authorities or there exists a history of futile complaints which makes any result from such complaints illusory;

(3) There is no time or opportunity to resort to the courts;

(4) There is no evidence of force or violence used towards prison personnel or other 'innocent' persons in the escape; and

(5) *The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat."*

We think these guidelines represent a sound and reasonable approach to the problems arising in our prison institutions which may occasionally force upon a member of the prison population *a choice between escaping or subjecting himself to death or serious bodily harm.* A person charged with the crime of escape should have available to him the defense of necessity or compulsion if he can demonstrate to the satisfaction of the judge or jury that *the facts surrounding his escape fall strictly within the guidelines* set out above in *Lovercamp.*

(Emphasis supplied).

In *United States v. Bailey,* 444 U.S. 394, 413, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), the case on which the appellant relies heavily, the Supreme Court pointed out that "a defendant accused of escape is not entitled to a jury instruction on the defense of necessity unless he proffered testimony of a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had lost its coercive force." In *Craddock v. State,* 47 Md.App. 513, 516, 424 A.2d 168 (1981), this Court upheld a trial court's refusal to provide a necessity instruction where the appellant had testified that he feared being shot by authorities if he had surrendered but where he was only actually returned to custody after his capture in Georgia approximately one month subsequent to his escape.

 If nothing else, the appellant clearly failed the fifth *Robinson* test. As Judge Rubin explained:

*[A]mong other items that need to be shown,* before the Court must instruct the jury on that matter, *is that the person made a bona fide effort to surrender or return to custody as soon as the claimed* duress or *necessity had lost its coercive force.* That was decided by the Supreme Court

in *Bailey.* It's adopted in *Craddock* by the Court of Special Appeals. And was adopted by the Fourth Circuit in *Sarno.*

Here the evidence is such that *even if one assumes without deciding there was the stress of the moment* if you will when Mr. Randolph saw the handcuffs and decided or reacted in his view to the notion that, well, he wasn't going back to Clarksburg, didn't want to go back to Clarksburg, *there is no question here that after the event, that is to say the leaving of the facility,* we don't have to call it an escape, but the *leaving of the facility for a substantial period of time during which there was a cooling off,* the defendant had conversations with his mother.

*The defendant called his counselor at the facility* to, my words not his, "sort of feel out" the situation. "What's going on?" "What'll happen if I come back?" "What'll happen if I stay out?" *There is clearly, there was deliberation and thoughtfulness and coolness on his part.*

So *at the very least that element is not made out by the evidence.*

(Emphasis supplied).

The appellant also, of course, failed the first *Robinson* test. Again, Judge Rubin explained:

So what I'm going to say is even if you find that the defendant was having problems with the institution, *he is not entitled to resort to self help* but must apply for his release or, I'm going to add, or other remedies through regular channels, because I think that's correct.

*If somebody is at an institution and they're having problems, it happens. They have rights of redress.* You can file, I told you this in the beginning, you can proceed administratively. You can sue everybody. You can bring a class action. You can follow suit under section—The point is you have rights. *But one of the rights is not just to leave. You have rights, but it doesn't include, "I'm checking out of the hotel." That it doesn't include.*

(Emphasis supplied).

There was no factual basis to support a necessity instruction.

160

■■■■■■■■

JUDGMENT AFFIRMED; COSTS TO BE PAID BY
APPELLANT.